# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| KENNETH J. DILLON, | : | |
| --- | --- | --- |
| Plaintiff, | : | Civil Action No.: 17-1716 (RC) |
| v. | : | Re Document Nos.: 14, 16 |
| U.S. DEPARTMENT OF JUSTICE, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### Denying Defendant's Motion for Summary Judgment; Denying Plaintiff's Motion for Summary Judgment

## I. INTRODUCTION

Over the course of three weeks in the fall of 2001, five people were killed and seventeen others were infected when several letters containing anthrax spores were mailed to the Washington, D.C. offices of U.S. Senators Patrick Leahy and Tom Daschle and to news media organizations in New York City and Florida. After a years-long criminal investigation, the Federal Bureau of Investigation ("FBI") determined that these attacks had been committed by Dr. Bruce Ivins, a scientist at the United States Army Medical Research Institute of Infectious Diseases ("USAMRIID"). But in July 2008, before federal prosecutors were able to obtain a grand injury indictment, Ivins committed suicide. Less than two years later, having concluded that Ivins had acted alone, the FBI formally closed its investigation without charging anyone and issued a ninety-six-page Investigative Summary outlining its findings.

The Plaintiff in this case, Kenneth J. Dillon, is among many who have expressed doubts about the FBI's ultimate conclusion over the years. A historian and author, Dillon questions whether Ivins was involved in the attacks at all. In pursuit of evidence that might support this

belief, Dillon submitted to the FBI two different requests for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The first of these requests asked for various pieces of evidence that Dillon believes the FBI possesses—particular emails that Ivins sent or received and certain lab notebooks that belonged to Ivins. The second request asked for thirty-eight pages of the FBI's Interim Major Case Summary ("IMCS"), a 2,000-page report produced in 2006, four years before the FBI concluded its investigation. Dillon asked for the report's twenty-two-page table of contents and its sixteen pages that discuss Ivins.

When he became dissatisfied with the FBI's initial responses to his requests, Dillon filed this lawsuit against the Department of Justice ("DOJ"), and presently before the Court are the parties' cross-motions for summary judgment as to both of Dillon's requests. For reasons explained in greater detail below, the Court denies each of these motions. With respect to Dillon's first request—the request for Ivins's emails and lab notebooks—the FBI ultimately responded by releasing seven pages of emails and ninety-eight pages of notebook material. But Dillon has pointed to other seemingly responsive emails known to have existed that remain unproduced. Because DOJ never meaningfully addressed the specific outstanding emails that Dillon identified, the Court concludes that there remains a genuine dispute as to the adequacy of the FBI's search. The Court therefore orders that DOJ file a notice within thirty days providing possible explanations for why the identified emails were not produced. If DOJ's notice meaningfully engages with Dillon's evidence in a way that assures the Court that it has conducted a good faith, reasonable search, the Court will enter judgment in DOJ's favor.

As for the second request, the one for the IMCS excerpts, in response to this request, the FBI informed Dillon that the IMCS is, in its entirety, protected by the deliberative process privilege and exempt from FOIA. *See* 5 U.S.C. § 552(b)(5). The Bureau therefore withheld all

thirty-eight of Dillon's requested pages in full. Dillon, unsurprisingly, disputes the FBI's assertion of privilege, and he argues that, at a minimum, the Court should review the thirty-eight pages *in camera* to ensure that the privilege does in fact apply and that the requested pages do not contain any "reasonably segregable," non-exempt information. *Id.* § 552(b)(5). On this point, the Court agrees with Dillon and concludes that *in camera* review is appropriate before judgment is entered in favor of either party. The Court thus orders that DOJ produce the thirty-eight pages within thirty days. If the Court agrees with DOJ that the excerpts are privileged in their entirety, it will enter judgment in DOJ's favor. If not, the parties will be permitted to renew their motions for summary judgment with respect to Dillon's second request based on other FOIA exemptions that DOJ has preserved in the alternative.

## II. BACKGROUND

### A. FOIA Request 1327397 – The Request for Evidence

Dillon submitted the first of his FOIA requests, which was assigned number 1327397, on April 18, 2015. The scope of the request was initially quite broad: It asked for, "in regard to the 2001 anthrax mailings, all email messages, laboratory notebooks, paper and computer files, and information about meetings and telephone conversations in September and October, 2001 of Dr. Bruce Ivins, USAMRIID." Decl. of David Hardy ("Hardy Decl."), Ex. S, ECF No. 14-4 at 18. After a back-and-forth between the parties, the FBI eventually released six pages of previously processed documents while stating that "[a]dditional records potentially responsive . . . may exist." *Id.*, Ex. X, ECF No. 14-4 at 28. If Dillon wanted a search for those records to be conducted, the Bureau advised that he should submit a new FOIA request. *Id.*

Instead of submitting a new request—which would have returned him to the back of the FBI's FOIA queue—Dillon filed an administrative appeal, in which he provided "an updated

3

specification of the records [the] FBI need[ed] to release in order to be responsive" to his request. *Id.*, Ex. Y, ECF No. 14-4 at 31. This updated list of records was more specific than his original request, but it also appeared to encompass additional categories of information that he had not previously asked for. The list included:

(1) "Ivins's emails to or from Patricia Fellows, Mara Linscott, Nancy Haigwood, [and] other individuals," which Dillon noted the FBI had "selectively" cited in the final Investigative Summary released to the public;

(2) "pages of [Ivins's] Notebook 4010 . . . and above all . . . the critically important Notebook 4282," which apparently documents the work Ivins was doing in his lab from August to September 2001;

(3) "all paper and computer files" on Ivins's work and personal computers;

(4) "[a]ll relevant records related to meetings Ivins attended" in September and October 2001;

(5) Ivins's telephone and credit card records;

(6) Ivins's "entry and exit records" for the building at USAMRIID "where genetically matching anthrax was stored"; and

(7) "records relating to Ivins's animal experiments" performed in September and October 2001.

*Id.*, Ex. Y, ECF No. 14-4 at 31–32.

In response to Dillon's appeal and this updated list of requested records, the FBI's administrative appeals staff affirmed the Bureau's action of releasing only the six previously released pages, concluding that the "FBI's response was correct and that it [had] conducted an adequate, reasonable search for responsive requests subject to the FOIA." *Id.*, Ex. AA, ECF No.

4

14-4 at 37.  Following this decision, Dillon replied by informing the FBI that he had been "largely persuaded" that the FBI did not currently "possess [any] not-yet-released documents on the activities of Bruce Ivins in September and October, 2001."  *Id.*, Ex. BB, ECF No. 14-4 at 40.  But Dillon remained skeptical that the FBI had released all of the documents that it had *ever* possessed—he continued to point, for example, to emails that were publicly known to exist but that had never been made public.  Dillon thus stated that he "ha[d] provisionally adopted the assumption that somebody must have destroyed" some of the evidence that he had requested.  *Id.*  To "test this assumption," Dillon narrowed his request substantially—to "two specific kinds of evidence": (1) "Ivins's emails to or from Patricia Fellows and Mara Linscott;" and (2) "Laboratory Notebook No. 4282."  *Id.*

Eventually, the FBI released two new batches of documents in response to this narrowed request—first, seven pages of new Ivins emails, then ninety-eight pages of records regarding the lab notebook.  Hardy Decl. ¶¶ 34–35, ECF No. 14-2.  According to David Hardy of the FBI's Records Management Division, these records were located by searching the Bureau's Central Records System ("CRS"), "an extensive system . . . consisting of applicant, intelligence, personnel, administrative, and general files compiled and maintained by the FBI" that "spans the entire FBI organization and encompasses the records of FBI HQ, FBI Field Offices, and FBI Legal Attaché Offices . . . worldwide."  *Id.*

The CRS is organized, Hardy explained, by "classifications," which are numerically sequenced files corresponding to "designated subject categories."  *Id.* ¶ 38.  When a case file is opened, it is assigned a Universal Case File Number ("UCFN"), made up of three parts: (1) a CRS classification number that refers to the type of subject matter involved, (2) the abbreviation of the FBI Office of Origin opening the file, and (3) an individual case specific file number.  *See*

*id.* ¶ 38 & n.3. But the CRS can be searched across case files using the system's "general indices," which include entries "on a variety of subject matters," including "individuals, organizations, events, or other subjects of investigative interest." *Id.* ¶ 39. The entries fall into two types of categories: (1) main entries, which, unsurprisingly, "carr[y] the name of an individual, organization, or other subject matters that is the designated subject of [a] file," and (2) reference entries, which "pertain[] to records that merely mention or reference an individual, organization, or other subject matter that is contained in a 'main' file record about a different subject matter." *Id.*

Large parts of the general indices are now automated and electronically available, in what the FBI refers to as the Universal Index ("UNI"). The UNI is accessible through two different electronic case management systems, the older of which is called Automated Case Support ("ACS"). *Id.* ¶ 41. Though ACS did not become effective until 1995, it "incorporate[s] prior automated FBI indices" and is therefore "capable of locating FBI records well before" then. *Id.* ¶ 42. The newer case management system is Sentinel, "FBI's next-generation . . . system that became effective FBI-wide on July 1, 2012." *Id.* ¶ 43. Sentinel has not replaced ACS; it merely "provides another portal to locate information within the . . . CRS for FBI records generated on or after July 1, 2012." *Id.*

In response to Dillon's request for evidence here, the FBI performed a search in both ACS and Sentinel. *Id.* ¶ 45. This search first included a three-way phonetic breakdown of "Bruce Edward Ivins," which means that the "computer automatically broke [the] name down and searched the index for three different breakdowns of the name entered"—"Bruce Edward Ivins," "Ivins, Bruce, Edward," and "Ivins, Bruce, E." *Id.* ¶¶ 45 & n.6. As part of the three-way phonetic search, the computer also "breaks [the] names down based on their phonetic

characteristics" and "return[s] results based on whether . . . they phonetically match a certain percentage of the first and last name searched." *Id.* ¶ 45 n.6. In addition to the three-way phonetic search, the FBI also performed an on-the-nose search for "Ivins, Bruce, Edward"—which, as one might expect, prompted the computer to search for exactly the name entered and only that name. *Id.* ¶ 45 n.7.

As a result of these various searches, the FBI located Bruce Ivins's investigative file in electronic format and "performed a page-by-page review of the entire file" to identify any documents that were responsive to Dillon's request. Second Hardy Decl. ¶ 8, ECF No. 20-1. Within the file, it found the seven pages of emails and ninety-eight notebook pages and released the pages to Dillon, redacting only to protect the privacy of third parties, with which Dillon does not now take issue in his motion for summary judgment. *See* Hardy Decl., Ex. FF, ECF No. 14-4 at 56–58; Pl.'s Mem. in Support of Cross-Mot. for Summ. J. at 4 & n.1 ("Pl.'s Mot."), ECF No. 16-1.

Dillon does, however, challenge the adequacy of the FBI's search, and he continues to assert that there remain additional publicly known emails that have never been released. *See* Pl.'s Mot. at 4–5; Decl. of Scott Hodes ("Hodes Decl."), Ex. A, ECF No. 16-4. In a February 2018 letter, Dillon listed several specific examples of such emails and asked that the FBI either "locate, and release [them] and identify all emails still being withheld," or "explain the universe of emails that are available and if any information was destroyed." Hodes Decl., Ex. A. As the FBI neither responded to this letter nor produced additional documents, Dillon now argues that the "FBI has failed to establish that its search methods for specific emails was reasonably calculated to uncover relevant documents." Pl.'s Mot. at 5.

## B. Request No. 1329350 – The Request for IMCS Excerpts

While all of this was going on, Dillon was simultaneously pursuing a second FOIA request, which he submitted to the FBI on May 15, 2015. Hardy Decl., Ex. A, ECF No. 14-2 at 2. Like his first request, this second request—which was assigned number 1329350—was initially broad: It asked for the entire 2,000-page ICS. *Id.* at 3. But also like Dillon's first request, the scope of the second request eventually narrowed greatly. After the FBI informed Dillon that the "best way to expedite [the] request [was] to keep it to 50 pages or less," he chose to focus on the IMCS's twenty-two-page table of contents and its sixteen pages that discuss Ivins. *Id.*, Ex. O, ECF No. 14-4 at 2.

The FBI later informed Dillon, however, that it intended to withhold those thirty-eight pages in full. *Id.*, Ex. R., ECF No. 14-4 at 12. The Bureau explained that "the analyses, evaluations, assessments, and conclusions contained within the IMCS [we]re pre-decisional and deliberative in nature . . . and that the release of the information contained in the[] records could reasonably be expected to interfere with the deliberative process and/or cause public confusion." *Id.* The IMCS was therefore, according to the FBI, privileged and "exempt from disclosure in its entirety pursuant to 5 U.S.C. § 552(b)(5)." *Id.* In its motion for summary judgment, the FBI reiterates that assertion of privilege and preserves additional FOIA exemptions in the alternative. But Dillon contends that the FBI has failed to establish that his specific requested excerpts of the IMCS constitute deliberative documents, and that the Bureau has failed to establish that any concrete harm would result from release of the requested pages. At a minimum, Dillon argues, the Court should review the thirty-eight pages *in camera* to ensure that all segregable, non-exempt information is released.

## III. LEGAL STANDARD

FOIA "sets forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 473 U.S. 214, 242 (1978)). "The Act requires government agencies to make information available upon request, unless the information is protected by one of nine statutory 'exemptions.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Pinson v. Dep't of Justice*, 313 F. Supp. 3d 88, 105 (D.D.C. 2018) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). As a general matter, summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it is "capable of affecting the substantive outcome of the litigation." *Pinson*, 313 F. Supp. 3d at 105. And a dispute is genuine if there exists sufficient evidence for a reasonable jury to return a verdict for the nonmovant. *Id.*

In FOIA cases, a government agency is "entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information.'" *Prop. of the People, Inc. v. Office of Mgmt. and Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)). "To meet its burden, a defendant agency may rely on declarations that are reasonably detailed and non-conclusory." *Pinson*, 313 F. Supp. 3d at 106. The agency's expertise reflected in these

declarations is entitled to "respect"; courts are cautioned not to "overstep the proper limits of the judicial role in FOIA review." *Id.* (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979)).

## IV. DISCUSSION

Two different disputes exist between the parties in this case. With respect to Dillon's first request—the request for the emails and notebook pages—the focus of the disagreement is on the adequacy of the FBI's search for the records. Dillon does not take issue with the minimal exemptions the Bureau claimed in response to that first request. By contrast, with regard to Dillon's second request—the request for the IMCS excerpts—the parties' disagreement centers entirely on the exemptions that the Bureau has claimed; there is no dispute over the adequacy of the FBI's search in response to the second request.

### A. The Adequacy of the FBI's Search in Response to Dillon's First Request

As already noted, for an agency to be entitled to summary judgment in a FOIA case, it must show that it conducted an adequate search for responsive records. *E.g.*, *Prop. of the People*, 330 F. Supp. 3d at 380. An adequate search for purposes of FOIA is one "reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). This standard does not require that the agency search "every record system" for the requested documents; rather, the agency "must conduct a good faith, reasonable search of those systems of records likely to possess the requested records." *Pinson*, 313 F. Supp. 3d at 107 (quoting *Marino v. Dep't of Justice*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013)). To prove that it has performed such a search, the agency must provide a "reasonably detailed" affidavit or declaration describing the agency's actions and the scope of the search. *Iturralde v. Comptroller of the Currency*, 315 F.3d

311, 313–14 (D.C. Cir. 2003) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Once the agency has submitted such an affidavit or declaration, "the burden shifts to the FOIA requester to produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Pinson*, 313 F. Supp. 3d at 107 (quoting *Morley*, 508 F.3d at 1116).

Here, the Court finds that DOJ has met its initial burden, but that Dillon has produced sufficient countervailing evidence to create a genuine dispute of material fact. DOJ included with its initial motion a declaration by David Hardy of the FBI's Record Management Division, which both outlined the Bureau's system of records—the CRS, the UNI, ACS, Sentinel—and described how that system was used to locate documents responsive to Dillon's request. *See* Hardy Decl. ¶¶ 37–47. The declaration explained how the FBI performed searches of the CRS in both ACS and Sentinel using multiple variations of Ivins's full name. These searches, the declaration stated, revealed an investigative file pertaining to Ivins, which was then reviewed for the emails and notebook pages that Dillon sought. *Id.* ¶¶ 45–47. The Court finds that this was enough "reasonably detailed" information to shift the burden to Dillon.

To meet that burden, Dillon essentially makes two different complaints in his own motion for summary judgment. First, he argues that Hardy's declaration did not include a sufficiently specific "description of the FBI's search through the investigative file." Pl.'s Mot. at 5. And second, Dillon cites to his February 2018 letter, which identified a number of purportedly responsive emails that are publicly known but remain unproduced. *See* Hodes Decl., Ex. A. According to Dillon, "the FBI should be required to state the status of th[o]se emails" before it is entitled to summary judgment. Pl.'s Mot. at 5.

DOJ has addressed the first of these concerns by submitting a second declaration from Hardy, which clarified that the located investigative file was in "electronic format," and that personnel from the FBI's Record/Information Dissemination Section "performed a page-by-page review of the entire file to identify all the documents" that were responsive to Dillon's request.[1] Second Hardy Decl. ¶¶ 7–8. But DOJ has not adequately responded to Dillon's other concern. Hardy's second declaration never specifically addressed the particular emails that Dillon cited in his February 2018 letter. Instead, it merely stated the obvious—that, as a general matter, "Ivins's USAMRIID emails are not FBI records under the FOIA," *id.* ¶ 6, but that "the FBI possesses select . . . Ivins emails because these emails are part of the FBI's criminal investigation into him," *id.* ¶ 7.

Dillon has provided evidence, though, that at least three of his identified emails *were* a part of the criminal investigation into Ivins.[2] All three were allegedly sent by Ivins to his assistant, Mara Linscott. *See* Hodes Decl., Ex. A. Two were apparently cited in an affidavit in support of a warrant to search Ivins's home, and the other was supposedly cited in the final Investigative Summary. *See id.* Both the affidavit and the Summary are publicly available, and they do in fact contain emails that seem to match Dillon's general descriptions—though they do not identify recipients of these emails by name. *See* Aff. in Support of Search Warrant by Thomas F. Dellafera at 13–14 (Oct. 31, 2007), https://www.justice.gov/archive/amerithrax/docs/07-524-m-01.pdf; U.S. Dep't of Justice, *Amerithrax Investigative*

---

[1] Hardy ultimately submitted a third declaration with DOJ's surreply, *see* ECF NO. 23-2, but the third declaration's brief discussion of the FBI's search procedures essentially repeated what had already been stated in the prior two declarations.

[2] The February 2018 letter cites two additional publicly known Ivins emails, but on their face, they are not responsive to Dillon's narrowed request, as they were not addressed to either Patricia Fellows or Mara Linscott. *See* Hodes Decl., Ex. A.

*Summary* at 65 (Feb. 19, 2010), https://www.justice.gov/archive/amerithrax/docs/amx-investigative-summary.pdf.  It is thus possible that Dillon is mistaken in believing that Linscott was the recipient—which would make the emails non-responsive and explain why they were not produced.

Another possibility is that the emails were in the possession of the U.S. Postal Inspection Service ("USPIS") instead of the FBI.  The affidavit Dillon cites was signed by Postal Inspector Thomas Dellafera, not by an FBI employee.  As a general matter, FOIA imposes no obligation on the responding agency "to make inquiries of other law enforcement agencies . . . for documents no longer within its control or possession." *White v. U.S. Dep't of Justice*, 840 F. Supp. 2d 83, 90 (D.D.C. 2012) (omission in original) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 328 (D.C. Cir. 1999)).  But, for our purposes here, employees of the USPIS and FBI served together on the task force that spent years investigating the anthrax attacks, and Hardy's second declaration stated that it "is FBI policy to import *all records* into the investigative case file."  Second Hardy Decl. ¶ 7 (emphasis added).  The Court cannot help but wonder, then, whether the FBI possesses certain USPIS-obtained records, or whether the FBI and USPIS have some record-sharing system in place with respect to the anthrax investigation.

A third possibility regarding the emails Dillon identified is that, for some reason, certain records related to the anthrax investigation were destroyed or returned.  This admittedly seems unlikely, though.  Given the importance of the investigation, one would not expect the investigative files to be subject to a routine document retention policy with a short destruction date.  And even if they were subject to such a policy, the investigation had only been closed for five years when Dillon submitted his FOIA request.  Dillon seems to suggest that the FBI may have destroyed these and other emails in bad faith—an allegation that the Court is reluctant to

credit.  But it did take nearly three years for the FBI to release any new documents in response to

Dillon's request, and if responsive documents were destroyed or returned to their originating

entities during that time period, summary judgment in favor of DOJ would be unwarranted.

*Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1004–05 (D.C. Cir. 2009) ("[S]ummary

judgment is inappropriate . . . if viewing all inferences in a light most favorable to [the FOIA

requester], a triable issue exists as to whether [the responding agency] intentionally destroyed"

the requested records after the FOIA request was submitted.); *see also Landmark Legal Found.

v. EPA*, 272 F. Supp. 2d 59, 66–67 (D.D.C. 2003) (granting summary judgment to responding

agency that wrongfully destroyed responsive records, but only after holding the agency in

contempt and ordering it to pay the FOIA's requester's fees and costs caused by the

"contumacious behavior").

The problem for the Court is that DOJ never substantively addressed Dillon's evidence of

unproduced emails, so the Court is left guessing as to what may have caused the alleged

discrepancy here.  This in and of itself demonstrates that there remains a genuine dispute

regarding whether the FBI "conduct[ed] a good faith, reasonable search of th[e] systems of

records likely to possess the requested records."  *Pinson*, 313 F. Supp. 3d at 107 (quoting

*Marino*, 993 F. Supp. 2d at 9).  To be sure, "the adequacy of a FOIA search is generally" not

judged "by the fruits of the search," *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641

F.3d 504, 514 (D.C. Cir. 2011), and the Act does not "require[] an agency to answer questions

disguised as a . . . request," *Hudgins v. IRS*, 620 F. Supp. 19, 21 (D.D.C. 1985).  But the burden

is ultimately on DOJ to show that its search was adequate.  And in this case, after the FBI

produced only four emails in total, *see* Second Hardy Decl. ¶ 7, Dillon identified at least three

more that are known to have been a part of the investigation.  Thus far, DOJ has failed to

meaningfully engage with this "countervailing evidence." *Pinson*, 313 F. Supp. 3d at 107 (quoting *Morley*, 508 F.3d at 1116). Instead, DOJ has essentially said, "these emails have always been in the sole possession of USAMRIID." This explanation is not plausible in light of the emails' known role in the investigation. Without more information, the Court is unable to conclude that DOJ has met its burden.

To hopefully assuage these concerns, the Court orders that DOJ submit a notice within thirty days providing any information within its knowledge that might explain why the three emails that Dillon has identified were not produced. This could include, but is of course not limited to, information about any document retention policies under which the documents may have been destroyed, or information about any record-sharing systems in place with the FBI and USPIS. The Court does not expect a definitive explanation for why the emails were not located or were not responsive—though one would certainly be welcomed. What is important is that DOJ actually respond to the evidence Dillon has presented. If DOJ meaningfully engages with that evidence in a way that assures the Court that it has acted in good faith, the Court will enter judgment in its favor. In the meantime, both parties' motions for summary judgment with respect to Dillon's first request are denied without prejudice.

### B. The FBI's Claim of Deliberative Process Privilege in Response to Dillon's Second Request

As noted earlier, the parties' dispute regarding Dillon's second request is not about the adequacy of the FBI's search. The FBI located the IMCS's table of contents and the sections discussing Ivins, but it has withheld the pages in full because, according to the FBI, the IMCS is, in its entirety, protected by the deliberative process privilege and exempt from FOIA. Dillon, meanwhile, questions this assertion of privilege and argues that, at a minimum, the Court should

review the requested excerpts *in camera* to ensure that the privilege actually applies and that all "reasonably segregable" portions of the documents are released.

In asserting its claim of privilege, the FBI relies on FOIA Exemption 5, which permits government agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). As one might expect, then, "Exemption 5 'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant,'—including the presidential communications privilege, the attorney-client privilege, the work product privilege, and," relevant for this case, "the deliberative process privilege." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)).

"The deliberative process privilege protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* at 38 (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). It "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." *Klamath*, 532 U.S. at 8–9 (citations omitted) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)). "To fall within . . . the privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). "A record qualifies for withholding only if it is both 'predecisional' and 'deliberative.'" *Prop. of the People*, 330 F. Supp. 3d at 382 (quoting *Access*

16

*Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991)). Thus, "[p]urely factual material usually cannot be withheld . . . unless it reflects an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors*, 641 F.3d at 513 (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)).

Of course, the burden is on the government agency to show that it has properly asserted the privilege. *E.g.*, *Prop. of the People*, 330 F. Supp. 3d at 380. And, unlike the agency's burden with respect to the adequacy of a FOIA search, its burden as to privilege "does not shift even when the [FOIA] requester files a cross motion for summary judgment because 'the Government ultimately [has] the onus of proving that the [documents] are exempt from disclosure.'" *Hardy v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (second and third alterations in original) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)). To meet its burden, the agency must offer "a relatively detailed justification" explaining why the privilege applies. *Elec. Privacy Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolff v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). But "exemptions from disclosure must be narrowly construed" as well, *Morley*, 508 F.3d at 1115, and the agency "cannot justify its withholdings on the basis of summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)).

Here, there is no doubt that the ICMS is "predecisional," as it was drafted four years before the FBI concluded its investigation. Significant portions of the report are also certain to be "deliberative"; the Court sees no reason to disbelieve the assertion that the IMCS is "a preliminary case summary drafted midway through the anthrax investigation [that] contains information, analyses, and suppositions based on the limited and incomplete evidence at the time" as well as "opinions and analyses based on inter-agency communications." Hardy Decl. ¶ 65. Nor does the Court doubt that release of certain parts of the IMCS could "inhibit inter-agency communications" and "create public confusion," as the FBI has claimed. *Id.* ¶ 66.

But the report is also 2,000 pages long, and the FBI has asserted that the entire thing is deliberative. This contention immediately draws some skepticism, because "the deliberative process privilege does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving*, 550 F.3d at 38. FOIA requires the same. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."). As noted above, then, for the factual information in the IMCS to fall within the ambit of the privilege here, the information must "reflect[] an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors*, 641 F.3d at 513 (quoting *Mapother*, 3 F.3d at 1539). In other words, the drafters of the report must have "'cull[ed] the relevant documents, extract[ed] the pertinent facts, organize[d] them to suit a specific purpose,' and 'identif[ied] the significant issues.'" *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014) (quoting *Mapother*, 3 F.3d at 1538).

In this case, the easiest way for the Court to determine whether the IMCS is the product of such a process is to look at the requested excerpts. Indeed, "[w]here the agency fails to meet

[its] burden, a not uncommon event," FOIA provides courts "a host of procedures" to determine whether the claimed exemption is proper, including discovery, further agency affidavits, and *in camera* review of the records in question. *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980), *abrogated on other grounds by Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 830–31 (D.C. Cir. 1983). Here, the Court thinks that the last of these options is the appropriate one. The documents at issue are relatively short in length—just thirty-eight pages—and the parties' "dispute . . . centers on the actual contents of the document[s]." *Id.*; *see also Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008). The FBI also has not expressed much, if any, opposition to the Court performing such a review. *See, e.g.*, Second Hardy Decl. ¶ 16 ("If the Court deems it necessary, the FBI will provide copies of the processed records to the Court for *in camera* inspection."); *cf. Allen*, 636 F.2d at 1299 ("[L]ittle basis for . . . concern [over judicial intrusion] exists when the agency itself proposes that the court conduct an in camera inspection of the document.").

The Court thus exercises its "broad discretion" to order production of the requested IMCS excerpts within thirty days. *Id.* at 1297. DOJ should, if necessary, produce classified and unclassified versions of the pages. If, after reviewing the excerpts, the Court concludes that the deliberative process privilege applies to the pages in their entirety, the Court will enter judgment in favor of DOJ. If, on the other hand, the Court concludes that the excerpts include reasonably segregable non-privileged information, the Court will permit the parties to renew their motions for summary judgment based on the other FOIA exemptions that DOJ has preserved in the

alternative.[3] For the time being, though, the Court denies both parties' motions for summary judgment as to Dillon's second request without prejudice.[4]

## V. CONCLUSION

For the foregoing reasons, DOJ's motion for summary judgment is **DENIED**, and Dillon's cross-motion for summary judgment is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: January 17, 2019                         RUDOLPH CONTRERAS
                                                United States District Judge

---

[3] In addition to Exemption 5, DOJ has preserved Exemptions 1, 3, 6, 7(C), and 7(E). *See, e.g.*, Def.'s Mot. for Summ. J. at 13–30, ECF No. 14.

[4] Dillon argues that the Court should order the release of the sixteen IMCS pages that discuss Ivins because DOJ neglected to include them in the "Exemption Application Index" that it submitted pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)). Dillon's argument seems to be that failure to include these sixteen pages in the *Vaughn* index constituted a waiver of all FOIA exemptions with respect to those pages. The problem with this contention, however, is that agencies are not required to submit a *Vaughn* index. Rather, "[a]n agency may carry its burden of properly invoking an exemption by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, *or both*." *Hardy*, 243 F. Supp. 3d at 162 (emphasis added). Here, DOJ has preserved its exemption claims with respect to the sixteen IMCS pages through submission of the declarations from David Hardy. *See, e.g.*, Hardy Decl. ¶ 67 ("The pre-decisional and deliberative nature of the IMCS readily falls under the deliberative process privilege and is exempt from disclosure pursuant to Exemption 5."); Second Hardy Decl. ¶ 14 ("[T]he FBI properly withheld all twenty-two pages of the ToC and the portions dealing with the topics specified by [Dillon] due to the deliberative nature of this report. Releasing *any part* of the IMCS would create public confusion and harm agency deliberations in current and future investigations." (emphasis added)).