# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                              |     |                     |               |
|------------------------------|-----|---------------------|---------------|
| KENNETH J. DILLON,           | :   |                     |               |
|                              | :   |                     |               |
| Plaintiff,                   | :   | Civil Action No.:   | 17-1716 (RC)  |
|                              | :   |                     |               |
| v.                           | :   | Re Document Nos.:   | 38, 42        |
|                              | :   |                     |               |
| U.S. DEPARTMENT OF JUSTICE,  | :   |                     |               |
|                              | :   |                     |               |
| Defendant.                   | :   |                     |               |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This FOIA suit arises from a series of events that began nearly twenty years ago. Over a three-week period in fall of 2001, five individuals were killed and seventeen others were infected by the anthrax spores contained in letters mailed to U.S. senators in Washington, D.C., and news media organizations in New York City and Florida. After a multi-year criminal investigation, the Federal Bureau of Investigation ("FBI") determined that Dr. Bruce Ivins, a United States Army Medical Research Institute of Infectious Diseases ("USAMRIID") scientist, was responsible for the attacks. But in July 2008, before any criminal charge was filed, Dr. Ivins committed suicide. Within two years, the FBI formally closed its investigation, concluding that Dr. Ivins had acted alone, declining to charge any other parties, and issuing a ninety-six-page Investigative Summary outlining the FBI's findings.

Plaintiff, an historian and author, has doubts about the conclusions the FBI draws in its Investigative Summary. Kenneth J. Dillon questions Dr. Ivins's involvement in the attacks at all and, seeking evidence to support his stance, has submitted two separate requests for records

under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  In his first request, Mr. Dillon sought certain evidence that he believes to be in the FBI's possession, namely particular email correspondence including Dr. Ivins and some of the lab notebooks that Dr. Ivins possessed.  In his second request, Mr. Dillon sought thirty-eight pages of the FBI's Interim Major Case Summary ("IMCS"), which is a 2,000-page report that was produced in 2006, four years before the FBI issued its ultimate findings with respect to the attacks.  The requested pages consist of a twenty-two-page table of contents and sixteen pages that discuss Dr. Ivins.

After nearly two years of administrative appeals and correspondence concerning both requests, Mr. Dillon grew dissatisfied with the FBI's response and filed this lawsuit in 2017.  This Court previously addressed Defendant's motion for summary judgment and Plaintiff's cross-motion for summary judgment with respect to both requests.  *See Dillon v. U.S. Dept. of Justice* (*Dillon I*), No. 17-cv-1716, 2019 WL 249580 (D.D.C. Jan. 17, 2019).  This Court denied both parties' motions.  For the first FOIA request, the Court found that Plaintiff's factual allegations of seemingly responsive, yet unproduced, emails created a genuine dispute as to the adequacy of the FBI's search.  *Id*. at *1.  Thus, the Court directed the government to file a notice "providing possible explanations for why the identified emails were not produced."  *Id*.  For the records located in response to Mr. Dillon's second request, which the FBI had withheld in its entirety under claims of deliberative process privilege, the Court directed DOJ to produce the thirty-eight pages for *in camera* review to confirm that the privilege did in fact apply and that the material did not contain any "reasonably segregable," non-exempt material.  *Id*. (citing, then quoting, 5 U.S.C. § 552(b)(5)).

Thereafter, DOJ submitted a notice explaining its additional search efforts and also provided the requested material, all of which remains classified, to this Court for *in camera*

review.  *See* Def.'s Notice of Submission of Documents for *In Camera* Review and Explanation

of Additional Search Efforts ("Def.'s Notice") 1–2, ECF No. 32.  As part of the FBI's response

to the Court's order in *Dillon I*, Defendant released redacted versions of three emails that it had

located in a "supplemental search of the anthrax mailing investigative file."  *Id.* at 2.  This

supplemental search "us[ed] the information provided by Plaintiff regarding the three emails" to

"focus[] its search on the file attachments" to the Amerithrax investigative file, which permitted

FBI to "locate additional responsive emails in a binder contained in the investigative file."  *Id.*

Plaintiff responded with a cross-motion for summary judgment again contesting the adequacy of

the FBI's search in response to the first FOIA request and contesting the application of FOIA

exemptions to the newly-produced material.  *See* Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Cross-

Mot."), ECF No. 42.  These motions are fully briefed, and the Court has reviewed the classified

material located in response to the second FOIA request.  For the forthcoming reasons, the Court

grants Defendant's renewed motion for summary judgment and denies Plaintiff's cross-motion.

## II.  BACKGROUND

### A.  The First FOIA Request (Request No. 1327397) – The Request for Evidence

Mr. Dillon submitted his first FOIA request, which was assigned number 1327397, on

April 18, 2015.  Initially, the request broadly sought, "in regard to the 2001 anthrax mailings, all

email messages, laboratory notebooks, paper and computer files, and information about meetings

and telephone conversations in September and October, 2001 of Dr. Bruce Ivins, USAMRIID."

Def.'s Mot., Ex. S, First FOIA Request, ECF No. 38-3 at 55.  After the FBI informed Mr. Dillon

that "[r]ecords responsive to [his] request were previously processed for another requester,"

Def.'s Mot., Ex. T, April 27, 2015 FBI Response, ECF No. 38-3 at 57, Plaintiff filed an

administrative appeal, Def.'s Mot., Ex. U, June 19, 2015 Administrative Appeal, ECF No. 38-3

at 59. In this appeal, Mr. Dillon specified "the records that FBI needs to release in order to be responsive." *Id.* This listing of records was simultaneously narrower and broader than the original request, insofar as it both more precisely pointed to particular records and also seemed to refer to new categories of information not contained in the original request. *See Dillon I*, 2019 WL 249580, at *2 (discussing updated list of records). Specifically, Mr. Dillon requested:

(1) "Ivins's emails to or from Patricia Fellows, Mara Linscott, Nancy Haigwood, or other individuals," which the FBI "selectively" cited in its publicly-released Investigative Summary, "includ[ing] those to and from Ivins's work email account and those to and from his personal accounts;"

(2) Ivins's laboratory notebooks "4010 regarding Ivins's Flask 1029 as well as relevant pages from Notebooks 3855, 3945, and 4251;"

(3) "[A]ll records for September and October, 2001 related to the computer installed in Ivins's B3 Suite in summer, 2001[,]", known as "MacIntosh MMCN E7380[,]" as well as "all paper and computer files, including on other work and personal computers used by Ivins;"

(4) "All relevant records related to meetings Ivins attended during September and October, 2001;"

(5) Ivins's telephone and credit card records;

(6) "[E]ntry and exit records" for Building 1412, the location at USAMRIID where "genetically matching anthrax was stored;" and

(7) "[R]ecords relating to Ivins's animal experiments" conducted in September and October, 2001, that "show his activities and whereabouts."

Ex. U at 59; *see also Dillon I*, 2019 WL 249580, at *2.

In response, the Department of Justice ("DOJ") Office of Information Policy advised Mr. Dillon that his administrative appeal had been received, Def.'s Mot., Ex. V, July 10, 2015 Letter Advising of Administrative Appeal, ECF No. 38-3 at 61, and subsequently remanded the request to the FBI to search for responsive records, Def.'s Mot., Ex. W, November 24, 2015 Letter, ECF No. 38-3 at 63. After this further search, the FBI notified Mr. Dillon in spring 2016 that it had "previously processed" records responsive to his request and provided him with six pages of these documents. Def.'s Mot., Ex. X, April 15, 2016 Letter, ECF No. 38-3 at 65.

Unsatisfied with this outcome, Mr. Dillon submitted a further administrative appeal in June 2016. Def.'s Mot., Ex. Y, June 17, 2016 Administrative Appeal, ECF No. 38-3 at 68. In it, he provided an "updated specification of the records that FBI needs to release to be responsive," once more broadly requesting:

(1) "Ivins's emails to or from Patricia Fellows, Mara Linscott, Nancy Haigwood, or other individuals," which were "selectively used" in the FBI's Investigative Summary, "includ[ing] those to and from Ivins's work email account and those to and from his personal accounts, including his laptop and home computer;"

(2) "[T]he remaining pages of Notebook 4010 regarding Ivins's Flask 1029," and, "above all," "critically important Notebook 4282;"

(3) Paper and computer files, including "all records for September and October, 2001 related to the computer installed in Ivins's B3 suite in summer, 2001[,] Macintosh MMCN E7380," and also including files located on "other work and personal computers used by Ivins;"

(4) "[R]ecords related to meetings Ivins attended during September and October, 2001;" and

(5)  Telephone and credit card records as well as building entry and exit records and information regarding Ivins's animal experiments.

Ex. Y at 68–69.

The DOJ's administrative appeals staff responded by affirming the FBI's prior actions, including the additional search conducted in response to the administrative appeals office's prior remand.  Def.'s Mot., Ex. AA, August 23, 2016 Letter, ECF No. 38-3 at 74 & n.1 ("[T]he FBI's response was correct and . . . it conducted an adequate, reasonable search for responsive records subject to the FOIA.").

Though he did not wholly accept this result, Mr. Dillon adjusted his stance after receipt of this August 2016 letter.  In his next correspondence with the FBI, which was received on January 4, 2017, Mr. Dillon stated that he had been "largely persuaded" by the responses to his appeals "that FBI does not possess not-yet released documents" concerning Dr. Ivins's activities in September and October, 2001.  Def.'s Mot., Ex. BB, ECF No. 38-3 at 77.  However, he suggested that there might, at one time, have been additional "exculpatory evidence" in the matter.  *Id.* (internal quotation and citation omitted).  To test his "provisionally adopted" "assumption that somebody must have destroyed this evidence," Mr. Dillon requested "two specific kinds of evidence for September and October, 2001."  *Id.*  He then listed a smaller subset of his previous requests, namely:

(1)  "Ivins's emails to or from Patricia Fellows and Mara Linscott;" and

(2)  "Laboratory Notebook No. 4282."

*Id.*  In response, as the Court previously described, "the FBI released two new batches of documents" that consisted of "seven pages of new Ivins emails, then ninety-eight pages of records regarding the lab notebook."  *Dillon I*, 2019 WL 249580, at *2 (citing Hardy Decl. ¶¶

34–35, ECF No. 14-2); *see also* Def.'s Mot., Ex. DD, ECF No. 38-3 at 83–84; Def.'s Mot., Ex. EE, ECF No. 38-3 at 87–88. Thereafter, Mr. Dillon filed his complaint in this case.

For this first FOIA request, the initial round of summary judgment briefings involved only the adequacy of the FBI's search. The FBI located records responsive to Mr. Dillon's narrower request "by searching the Bureau's Central Records System ('CRS'), 'an extensive system'" that includes all files "compiled and maintained by the FBI[,] . . .worldwide." Def.'s Mot., Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 38, ECF No. 38-2; *see also Dillon I*, 2019 WL 249580, at *2 (quoting Hardy Decl. ¶¶ 34–35, ECF No. 14-2). To organize this material, the CRS uses numerical sequences of files known as "classifications," which correspond to "designated subject categories." Seidel Decl. ¶ 39. These categories include both "types of criminal conduct and [FBI] investigations" and subjects that "pertain[] to," *inter alia*, counterterrorism, intelligence, and personnel matters. *Id.* Once a case file is opened, it receives a Universal Case File Number ("UCFN") that has three sequential parts: (1) the CRS file classification number that designates the subject matter therein; (2) the abbreviation associated with the FBI "Office of Origin" that opened the file; and (3) an "individual case file number for that particular subject matter," which is specific to that case. *Id.* & n.4. To locate material in the CRS, FBI employees rely on the general indices, which are the "'key' to locating records." *Id.* ¶ 40. The entries in the general indices consist of two category types: (1) main index entries, which are "created for each individual or non-individual that is the subject or focus of an investigation," and which are "identified in the title of most documents in the case file;" and (2) reference index entries, which are created for individuals or entities that are "associated with the case but not a known subject or focus of an investigation." *Id.*

Because the searches at issue in this suit concern material that was generated before 2012 but which was searched after 2012, two FBI database and search systems are relevant.[1] From 1995 until 2012, the FBI relied on its "Automated Case Support ('ACS')" system to "locate, retrieve, and maintain information" in these files. *Id.* ¶ 42. ACS is an "electronic, integrated case management system" that became effective in 1995. *Id.* It includes over 105 million CRS records that were converted from prior automated systems and is accessible by all FBI offices. *Id.* ACS permits access to the CRS' automated index, which is known as the Universal Index ("UNI"). *Id.* ¶ 43. Because "ACS implementation built upon and incorporated prior automated FBI indices," "a search employing the UNI application of ACS encompassed data that was already indexed" into a previous system and "was capable of locating FBI records created before [ACS'] 1995 FBI-wide implementation." *Id.*

On July 1, 2012, the FBI introduced a newer case management system known as Sentinel. Sentinel "includes the same automated applications" in a web-based interface. *Id.* ¶ 44. Although all FBI records created after July 1, 2012, are placed electronically in case files via Sentinel, this new system "did not replace ACS and its relevance as an important FBI search mechanism." *Id.* From July 1, 2012, until August 1, 2018, "any information indexed within Sentinel was backfilled in ACS." *Id.* On August 1, 2018, the FBI decommissioned ACS as a "stand-alone investigative database" and transferred ACS' "index searching functionality, index records, and digitized investigative records" into Sentinel. *Id.* ¶ 45. Using this combination of

---

[1] Although the Court discussed these databases and the associated organizational and indexing systems in *Dillon I*, the government's renewed motion for summary judgment includes a new declaration discussing these systems that replaces the FBI's prior declarations. Seidel Decl. ¶ 4 (citing ECF Nos. 14-3, 20-1, 23-2, 32-1). For clarity, the Court describes the databases here, drawing only from the material in the Seidel Declaration.

systems, it remains possible to conduct "a separate 'ACS search' function within Sentinel" to search for "all index data (UNI) previously searched through ACS." *Id.*

ACS was the operational system at the time that the FBI searched for records in response to Mr. Dillon's requests. *Id.* ¶ 46. At that time, standard practice was to begin a search with an index search in UNI (via ACS). *Id.* If there was a reasonable expectation that records were created on or after July 1, 2012, when the Sentinel system was implemented, then the FBI "built on its ACS index search by conducting an index search of Sentinel records." *Id.* A search of these two automated indices canvasses "approximately 120 million searchable records," updated daily. *Id.* That said, this automated process still requires human review. *Id.* ¶ 47. This is the case because, when a search is conducted, "location of records indexed to the subject" of a given request "does not automatically mean the indexed records are responsive to the subject." *Id.* To make a responsiveness determination, an analyst must consider the "specific parameters of individual requests" and apply these parameters to the records that the FBI has located. *Id.*

Applying these methods, the FBI searched both ACS and Sentinel in response to Plaintiff's FOIA requests. *Id.* ¶ 49. FBI searched these databases for the words "Bruce Edward Ivins," *id.* ¶ 53, and also conducted a "three-way phonetic breakdown" of the name "Bruce Edward Ivins," *id.* ¶ 49. In this three-way phonetic breakdown, a computer automatically queried different possible combinations of Dr. Ivins's name (e.g., "Ivins, Bruce, Edward" and "Ivins, Bruce E") and broke down the name based on its "phonetic characteristics," returning results "based on whether or not they phonetically match a certain percentage of the first and last names searched." *Id.* ¶ 49 & n.7. The FBI also conducted an "on-the-nose" search for the precise name "Ivins, Bruce, Edward." *Id.* ¶ 49 & n.8. These queries located records that had been indexed under "Bruce Edward Ivins" and "Amerithrax," some of which FBI analysts

deemed responsive to Mr. Dillon's request. *Id.* The agency's responsiveness review consisted of a "page-by-page electronic review of the entire [Amerithrax] file through ACS and Sentinel to locate records relating to Bruce Ivins, and then specifically his laboratory notebook no. 4282" as well as the emails identified in Mr. Dillon's most recent letter to "test" his assumption concerning destruction of materials. *Id.* ¶ 53. These search efforts produced Notebook No. 4282 and seven pages of responsive emails, and the FBI sought summary judgment on the belief that the search "was reasonably likely to locate all records responsive to Plaintiff's narrowed request." *Id.* ¶ 54; *see also id.* ¶ 56 (stating that, after review of Plaintiff's opposition, the FBI "had no positive indication" that any further emails to which Plaintiff pointed "were ever actually in the FBI's possession").

However, in *Dillon I*, this Court disagreed and, accordingly, denied summary judgment concerning the adequacy of the FBI's search. *See* 2019 WL 249580, at *1. The Court emphasized that the records that the FBI located did not include "at least three" emails that Mr. Dillon specifically identified in a February 2018 letter sent by his counsel as "part of the criminal investigation into Ivins," and which publicly-available material suggested could be responsive to his request.[2] *Id.* at *6. Because the FBI "never substantively addressed Dillon's evidence of unproduced emails," the Court directed Defendant to "respond to the evidence Dillon has presented . . . [and] meaningfully engage with that evidence in a way that assures the Court that it has acted in good faith." *Id.* at *7.

---

[2] As the Court discussed in *Dillon I*, 2019 WL 249580, these potentially responsive emails were mentioned in an affidavit in support of a search warrant signed by Postal Inspector Thomas F. Dellafera of the United States Postal Inspection Service. Def.'s Mem. of P. & A. in Supp. of Renewed Mot. for Summ. J. ("Def.'s Mem.") 11, ECF No. 38-1.

Defendant subsequently filed supplementary materials with the Court. *See* Def.'s Notice. In an additional declaration attached to DOJ's notice, Defendant addressed the FBI's search for the "three emails purportedly sent to Mara Linscott that Dillon identified in his February 2018 letter." *Id.* at 2. More specifically, Defendant indicated that, in response to the Court's order in *Dillon I*, the FBI tasked "subject matter experts at the Washington Field Office ('WFO')" with a further search of "any locations where responsive email records should be located within the anthrax mailing [Amerithrax] investigative file." Fourth Declaration of David M. Hardy ("Fourth Hardy Decl.") ¶ 3, ECF No. 32-1. Based on the information that Plaintiff had provided, WFO searched "the file attachments," referred to as "1A attachments," and "was able to locate binders of email records that, due to the massive size of the investigative file, were apparently overlooked in the FBI's original search through this file." *Id.* Defendant indicates that the Amerithrax investigative file includes over 8,000 1A attachments. *Id.* ¶ 3 n.2. The material located therein included the "emails specifically pointed to by Plaintiff." *Id.* ¶ 3. Defendant processed a total of 343 pages of additional email records, releasing 102 in part with redactions pursuant to FOIA exemptions (b)(6) and (b)(7)(c), and withholding 241 pages in full as "duplicative of other documents" previously produced. *Id.* ¶ 4. Pending before the Court with respect to this FOIA request are Defendant's renewed motion for summary judgment and Plaintiff's cross-motion, which contests both the adequacy of the search and the application of FOIA exemptions to the newly-produced email records.

**B. The Second FOIA Request (Request No. 1329350) – The Request for IMCS Excerpts**

In tandem with this FOIA activity, Mr. Dillon pursued a second request, assigned number 1329350, in May 2016. *See* Def.'s Mot., Ex. A, ECF No. 38-3. This request initially sought the entirety of the 2000-page IMCS, *id.* at 3, but ultimately narrowed to focus on thirty-eight pages

of this document, Def.'s Mot., Ex. O, ECF No. 38-3 at 39–43.  In *Dillon I*, only the application of FOIA exemptions to the material was at issue.  *See* 2019 WL 249580, at *7.  In the first round of summary judgment briefings, FBI asserted that it may properly withhold all of the material in its entirety pursuant to the deliberative process privilege, 5 U.S.C. § 552(b)(5), because the entirety of the IMCS is "deliberative," *Dillon I*, 2019 WL 249580, at *8.  Expressing "some skepticism" in light of the fact that this privilege does not "protect documents in their entirety," but rather requires the government to "segregate and disclose non-privileged factual information within the document," *id.* (quoting *Loving v. DOD*, 550 F.3d 32, 38 (D.C. Cir. 2008)), the Court directed Defendant to produce the requested excerpts for *in camera* review to confirm that there was no "reasonably segregable portion of [the] record," 5 U.S.C. § 552(b).  In response to the Court's order, Defendant indicated that the submissions contain classified information, Def.'s Notice ¶ 1, and the Court has received the material for its *in camera* review.  Defendant's motion for summary judgment and cross-motion contesting Defendant's applications of FOIA exemptions are ripe for the Court's disposition.

## III.  LEGAL STANDARD

Congress enacted FOIA to permit citizens to discover "what their government is up to." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J. dissenting)).  FOIA requires the agency to disclose records located in response to a valid FOIA request, unless material in the records falls within one of FOIA's nine statutory exemptions.  5 U.S.C. § 552(b); *see also Judicial Watch, Inc. v. DOD*, 847 F.3d 735, 738 (D.C. Cir. 2017); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975).

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Pinson v. DOJ*, 236 F. Supp. 3d 338, 352 (D.D.C. 2017) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). In general, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable factfinder to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In a FOIA suit, summary judgment is appropriate "if no material facts are genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information.'" *Prop. of the People, Inc. v. OMB*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)).

A court addressing a motion for summary judgment in a FOIA suit is to review the matter *de novo*. *See* 5 U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. IRS.*, 915 F. Supp. 2d 174, 179 (D.D.C. 2013) (internal quotation omitted). The reviewing court may grant summary judgment based on the record and agency declarations if "the agency's supporting declarations and exhibits describe the requested documents and 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Pronin v. Fed. Bureau of Prisons*, No. 17-cv-1807, 2019 WL 1003598, at *3 (D.D.C. Mar. 1, 2019) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C.

Cir. 2009)).  The court is to strike a balance between adequate review and respecting an agency's expertise and, accordingly, should not "overstep the proper limits of the judicial role in FOIA review."  *Hayden v. NSA/CSS*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

## IV.  ANALYSIS

### A.  The First FOIA Request

With respect to the first FOIA request, Mr. Dillon challenges both the adequacy of the search and the application of FOIA exemptions to material identified in a supplemental search. The Court will discuss each aspect of Plaintiff's challenge in turn.  For the following reasons, the Court grants Defendant's motion for summary judgment concerning both the adequacy of the search and the exemptions applied to the material produced in response to the first FOIA request.

#### 1.  Challenge to Adequacy of FBI's Search

##### a.  Scope of the FBI's Search

Before assessing whether Defendant's search was adequate, the Court must resolve an antecedent matter: the scope of Plaintiff's first FOIA request.  Although the prior round of summary judgment briefing did not present this issue, Plaintiff now raises it in light of the FBI's production of the emails to which Plaintiff had pointed in *Dillon I*.  *See* Pl.'s Mem. P. & A. in Supp. of Pl.'s Cross-Mot. ("Pl.'s Mem.") 7–11, ECF No. 41.  At the heart of this dispute is the letter in which Mr. Dillon "provisionally adopted," and attempted to "test," his "assumption" that any evidence that FBI had not produced had been destroyed.  Def.'s Mot., Ex. BB.  In this letter, which was received in early January 2017, Plaintiff specifically sought two kinds of records: (1) "Ivins's emails to or from Patricia Fellows and Mara Linscott;" and (2) "Laboratory Notebook No. 4282."  *Id.*  From Mr. Dillon's point of view, this letter did not formally narrow his request; rather, it represented a "test" to "confirm or refute his assumption that [other] records [previously

14

in the FBI's possession] had been destroyed." Pl.'s Mem. 3. Plaintiff asserts that the focus on

these "two sets of specific records" was strategic insofar as "he was certain that a reasonable

search would have uncovered [them] if they had not been destroyed." *Id.* (citing Ex. BB). Thus,

citing to his previous reply in the first round of summary judgment briefings wherein Mr. Dillon

"clarifi[ed] that the full scope of the initial request remained at issue," *id.* at 11, Plaintiff now

opposes the FBI's move to "unilaterally construe[] Mr. Dillon's letter as a new FOIA request

which was limited in scope to the[se] two sets of records," *id.* at 4. And because, on Plaintiff's

account, "the FBI improperly narrowed the scope" of this FOIA request, Mr. Dillon argues that

the FBI "should be required to conduct further searches," the scope of which "will depend on"

information that he seeks concerning "the nature of the FBI's other holdings." *Id.* at 11.

Defendant, unsurprisingly, construes the letter and the FBI's responses to it quite

differently. From DOJ's point of view, Mr. Dillon's letter represented in no uncertain terms a

"narrowed" request that was "limited" to these two items. Def.'s Opp'n to Pl.'s Cross-Mot. and

Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") 4, ECF No. 44; *see also* Seidel Decl. ¶¶

53, 54, 56 (discussing "Plaintiff's narrowed request[]"). Defendant argues that, through his

representations in this letter, "Plaintiff clearly narrowed his request to the items already searched

for and located by the FBI" (e.g., the portions of the requested notebook and the three emails that

the FBI has now produced). September 12, 2019 Declaration of David M. Hardy ("Sept. 2019

Hardy Decl.") ¶ 6, ECF No. 44-1. Defendant also contends that Plaintiff's characterization of

"the narrowing of his request . . . [as] merely a 'test' to determine if evidence was destroyed"

amounts to little more than an attempt to distract from Plaintiff's own failure to provide any

"factual basis showing why he believes the FBI has not now captured all records responsive to

his narrowed request." *Id.* ¶ 6 (citing Pl.'s Mem. 8). Finally, Defendant rebuts Plaintiff's

argument on policy grounds, contending that FOIA searches would become inefficient and unwieldy "[i]f the FBI were to conduct searches based on narrowed requests, only to later conduct additional searches following expansion of narrowed requests." *Id.*

In resolving this dispute, it is the Court's duty to review the record *de novo*, including the scope of the FOIA request. *See Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 97 (D.D.C. 2013) (citing 5 U.S.C. § 552(a)(4)(B); *Physicians for Human Rights v. DOD,* 675 F. Supp. 2d 149, 156 (D.D.C. 2009); *Mead Data Central, Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 252 (D.C. Cir. 1977)); *Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 70 (D.D.C. 2017) (citing 5 U.S.C. § 552(a)(4)(B)). For the forthcoming reasons, the Court concludes that Mr. Dillon narrowed the scope of his initial request for evidence and may not now revert to the initial, broader scope in seeking records responsive to his first FOIA request.

To discern the scope of the request, "[t]he linchpin inquiry is whether the agency is able to determine 'precisely what records are being requested.'" *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (quoting S. Rep. No. 93-854, at 10 (1974)). Although "a FOIA requester has an obligation to 'reasonably describe[ ]' the records he seeks," "an agency analyzing his request 'also has a duty to construe [the] FOIA request liberally.'" *Wallick*, 281 F. Supp. 3d at 67 (first quoting 5 U.S.C. § 552(a)(3), then quoting *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995)). As a practical matter, then, the question is whether the phrasing of the request would permit a "professional employee of the agency who was familiar with the subject area of the request" to "locate the record with a reasonable amount of effort." *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990) (quoting H.R. Rep. No. 876, 93d Cong., 2d Sess. 5–6 (1974)); *see also* 28 CFR § 16.3 (setting forth DOJ regulations concerning FOIA and instructing a requester to "describe the records sought in sufficient detail to enable

Department personnel to locate them with a reasonable amount of effort").

In this instance, the parties' contestations center on the effect of the language in Plaintiff's letter supporting his most recent administrative appeal. The issue, in other words, is not that the initial request is broad and the agency has contended that it had difficulty determining what, precisely, the requester sought. Nor is the issue that there is a particular ambiguous and contested phrase in the request. Rather, Plaintiff argues that his initially broader request cannot be improperly narrowed, and, moreover, that his more specific request for two enumerated records in his letter, *see* Ex. BB, does not amount to a narrowing of the FOIA request itself, *see* Pl.'s Mem. 7–11.

Mr. Dillon's contention, however, misconstrues what FOIA requires. The FBI's duty to "interpret FOIA requests liberally and reasonably" does not require it to "extend the meaning of the request to include things" that the requester did not seek. *Wallick*, 281 F. Supp. 3d at 67 (citing *Adamowicz v. IRS*, 552 F. Supp. 2d 355, 362 (S.D.N.Y. 2008); *Mogenhan v. DHS*, No. 06-2045, 2007 WL 2007502, at *3 (D.D.C. July 10, 2007)); *see also Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) ("[Plaintiff's] request was not broadly drawn; it made a specific inquiry about specific actions. The agency was bound to read it as drafted, not as either agency officials or [Plaintiff] might wish it was drafted."). The letter that Mr. Dillon submitted in the context of an administrative appeal outright states that Plaintiff sought "two specific kinds of evidence." Ex. BB. Any "professional employee of the agency who was familiar with the subject area of the request," *Truitt*, 897 F.2d at 545 n.36, would naturally construe the request as—based on the plain text of Plaintiff's appeal—seeking only those two items.

The Court's conclusion is further reinforced by Plaintiff's own conduct. Notably, Mr. Dillon at no point stated in the letter, nor in any subsequent appeal to or communication with the

FBI, that this "test" of his "assumption" was a request that operated in parallel with the broader FOIA request.[3]  Rather, this particular, and more narrowly specified, administrative appeal occurred after he had previously reiterated the broader scope of the records he sought.  *See* Def.'s Mot., Ex. U; Ex. Y.  And it occurred against the backdrop of his second FOIA request, for which Mr. Dillon was informed by an FBI specialist on April 11, 2016, that a move to "reduce the scope of the original [second] request" would lead the agency to "process that, close that request, then open a new request for additional material."  Def.'s Mot., Ex. O at 39.  Such a move left Mr. Dillon with the option "to submit a request for any remaining material [he'd] be interested in at a later date."  *Id.* at 41.  Plaintiff was thus on notice that a move to reduce the scope of a request would lead the agency to process and close that request, leaving Mr. Dillon "welcome" to pursue another, "new request for additional material."  *Id.* at 39–41.

Accordingly, on the Court's read of the text of the letter in the broader context of Plaintiff's ongoing appeals to and communications with the FBI concerning his FOIA requests, it appears self-evident that the letter limited the search for responsive records to the two requested items—and thereby narrowed the original request.  *Accord Dillon I*, 2019 WL 249590, at *2 (characterizing the test letter as one that "narrowed his request substantially").  The Court, moreover, notes that Plaintiff's own complaint and cross-motion in the first round of summary judgment briefings, submitted by his former counsel, characterize the request as it was made in this letter as a more limited, narrower version of the original submission.  *See* Def.'s Reply 4 (making this point); Pl.'s Compl. ¶ 20, ECF No. 1 (stating that Plaintiff's "letter dated December

---

[3] As the Court discusses next, Plaintiff also does not provide any precedent indicating that FOIA requests can, as a matter of law, operate in this fashion.

22, 2016 limited his request to two items"); Pl.'s Mem. P. & A. in Support of Cross-Mot. 4, ECF No. 16-1 ("Plaintiff narrowed his request in FOIA Number 1327397.").

Plaintiff's present arguments before the Court do not change this conclusion. For one, Mr. Dillon does not provide any legal authority or argumentation to support his proposition that a FOIA requester may preserve two versions of a request—one narrower and one broader—and press the agency to pursue the narrower claim while reserving the option to return to the broader version if a test theory concerning the narrower version has a particular result. To be sure, "a FOIA request might reasonably seek all of a certain set of documents while nonetheless evincing a heightened interest in a specific subset thereof." *LaCedra v. Executive Office for U.S. Attorneys,* 317 F.3d 345, 348 (D.C. Cir. 2003). But that is not what Plaintiff did here. Instead, Mr. Dillon affirmatively indicated that he was seeking only the specific subset, without continuing to seek the records specified in the initial, broader request or his subsequent iterations of that request. Whether he did so to assess the validity of a provisional assumption speaks to his motivations and beliefs—not to his communication about the request with the agency. Plaintiff's assertion that the FBI "revealed that there were other locations where potentially responsive records might exist" after Mr. Dillon had narrowed his target to the "portion of the request as to which he could provide countervailing evidence that the FBI's search was inadequate," Pl.'s Mem. 8, is therefore besides the point.

Moreover, Mr. Dillon's subsequent statements during litigation do not alter the content of the request itself. Plaintiff's contention that a FOIA requester can explicitly narrow, test, and then broaden his request in this way after filing litigation sits without any firm basis in the statutory text or associated case law. *See Gillin v. IRS*, 980 F.2d 819, 823 n.3 (1st Cir. 1992) (stating that Plaintiff's clarification of the scope of the request "during the course of th[e]

litigation . . . came too late to be relevant, since it amounted to an impermissible attempt to expand a FOIA request after the agency has responded and litigation has commenced"); *Pray v. DOJ*, 902 F. Supp. 1, 2 (D.D.C. 1995), *aff'd in part, rev'd in part on other grounds,* No. 95-5383, 1996 WL 734142 (D.C. Cir. Nov. 20, 1996) (limiting lawsuit to "scope of plaintiff's FOIA request, the content of his complaint in this action, and the subject of his administrative appeal"). Plaintiff cannot, after filing his lawsuit here, adjust his FOIA request by re-characterizing the text that he made therein through his argument before this Court. Thus, Mr. Dillon's attempts to use arguments that he made during litigation to reframe the terms of his administrative appeal, the plain text of which narrowed the request, are unavailing.

Plaintiff's further assertions concerning the prior round of summary judgment briefing do not save his argument. Continuing to contest Defendant's charge that his request was, as a matter of fact, narrowed, Mr. Dillon points to statements in his previous reply brief clarifying that he continued to "press the full scope of his initial request" as soon as "it became clear that the FBI did in fact possess additional potentially responsive records." Pl.'s Mem. at 9; *see also id.* at 10 ("Once it became clear that there were other locations which contained records potentially responsive to Mr. Dillon's initial request, he quickly asserted his right to have the FBI search these locations."). This argument, however, still does not speak to why the letter itself—which contains the latest version of the request—should be construed as pursuing the broader request when its plain text pursues a narrowed request. Mr. Dillon cannot, having limited the scope of the search, turn around and say that this limited search is inadequate in its scope.[4] *See McClanahan v. DOJ*, 712 F. App'x 6, 8 (D.C. Cir. 2018) (affirming adequacy of search based on

---

[4] Whether the FBI adequately searched for the records that Mr. Dillon specified in his narrowed request from the agency is a discrete question that the Court addresses *infra* Section IV.1.B.

text of request, and not "plaintiffs' current characterization" during litigation); *Lechliter v. DOD*, 371 F. Supp. 2d 589, 595 (D. Del. 2005), *aff'd sub nom. Lechliter v. Rumsfeld*, 182 F. App'x 113 (3d Cir. 2006) (citing *Nation Magazine v. Dep't of State,* No. 92–2303, slip. op. at 12 (D.D.C. Aug. 18, 1995)) ("A requestor may not challenge the adequacy of a search after an agency limits the scope of a search in response to direction from the requestor.").

Perhaps sensing the thinness of his argument on the merits, Mr. Dillon's final salvo invokes equity-based considerations to urge the Court to read the request broadly. Pl.'s Mem. at 10. Specifically, Plaintiff suggests that, because representations made by the DOJ and FBI "led Mr. Dillon to submit the 'test' letter, it would be inequitable to limit the scope of Mr. Dillon's request now that it has turned out that Defendant's representations were made based on an erroneous factual premise regarding the existence of locations which might contain additional responsive records." *Id.* And because, moreover, his assertions in the letter and in the prior briefings "were based on fraud, inadvertence, or mistake," Mr. Dillon asserts that he is entitled to revert to a broader characterization of the request. *Id.* (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980)). Though Plaintiff stops short of outright alleging bad faith on Defendant's part, the Court senses this message in the subtext of Mr. Dillon's contentions. However, Plaintiff does not provide any concrete evidence of bad faith, and the Court will not, without more, infer it, particularly given the relatively detailed, non-conclusory information provided in DOJ's declarations. *See McClanahan*, 712 F. App'x at 8 ("Because the declarations are 'relatively detailed and non-conclusory,' we accord them 'a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'" (quoting *Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015)).

In any event, Mr. Dillon's equity-driven line of argument does not persuade the Court because Plaintiff once more conflates the scope of the request and other considerations. At no point do Mr. Dillon's contentions speak to the Court's most logical read of the letter containing the most recent version of the request as narrowing the initial request. If Mr. Dillon seeks to renew his broader request given his full awareness of the FBI's representations, he is entitled to submit a new FOIA request. But it is not "inequitable" to hold Plaintiff to the plain text of his own request.[5] Thus, the Court concludes that the narrower scope enumerated in the contested letter represents the active request for this suit.

### b. Adequacy of the FBI's Search

The Court now turns to the adequacy of Defendant's search for the records identified in Mr. Dillon's narrowed request. As noted previously, in response to the Court's order in *Dillon I*, Defendant initiated additional search efforts seeking the three emails that Plaintiff had identified. *See* Def.'s Notice. Specifically, the FBI's WFO "conducted an additional search of the file attachments" (1A attachments) to the Amerithrax investigative file. Fourth Hardy Decl. ¶ 3. Parsing the "over 8,000 1A attachments in the investigative file," *id*. & n.2, the WFO "locate[d] binders of email records that, due to the massive size of the investigative file, were apparently overlooked in the FBI's original search," *id*. ¶ 3; *see also* Seidel Decl. ¶ 57. The potentially responsive material was sent to specialists in DOJ's Records/Information Dissemination Section ("RIDS") for processing of "*all emails* between Ivins and specified colleagues for the time period of September through October, 2001, not just the three emails explicitly mentioned by

---

[5] Plaintiff also contends that neither judicial estoppel nor equitable estoppel bar a change in position regarding the request. Pl.'s Mem. 10–11. This argument similarly does not speak to the operative conclusion: for the reasons previously discussed, the request *itself* was narrowed. Thus, it does not alter the Court's conclusion here.

Plaintiff." Seidel Decl. ¶ 57. The FBI's review identified "a high percentage of duplicates as a result of there being three copies of the same email collection within the additional email records" that FBI located. *Id*. Where an email had "additional handwritten notes," FBI processed these pages for release. *Id*. Processed copies of these email records were released to Plaintiff. Fourth Hardy Decl. ¶ 4. Contending that, with these efforts, "FBI performed an adequate search of those systems where responsive records would reasonably be found," and further noting that there are "no indications [that] additional responsive records exist within the Amerithrax investigative file, or in any other location FBI records are housed," Defendant moves for summary judgment on the adequacy of its search. Seidel Decl. ¶ 58.

Mr. Dillon, however, asserts that the FBI's additional search efforts only underscore the inadequacy of the agency's search. Plaintiff's core contention is that Defendant is not entitled to summary judgment because the FBI's production of emails that it had initially overlooked is a signal that "potentially responsive records exist in other locations." Pl.'s Mem. 5. Mr. Dillon raises several distinct points in support of this argument. First, Plaintiff suggests that the binder that FBI searched, "entitled 'Review of Compaq Presario Hard Drive, [Redacted Name], 2001 Ivins and [Redacted Name] Email Exchanges,'" does not contain "all the potentially responsive emails in the FBI's possession." *Id*. Second, Plaintiff challenges the FBI's "continue[d] . . . obfuscat[ion of] the locations of all of Ivins's emails in its possession[] [d]espite repeated requests from Mr. Dillon that the FBI account for the 'universe' of such emails." *Id*. at 6. In particular, Plaintiff points to the FBI's failure to search "the most obvious location where Ivins's emails would be located, which is on the computers that were seized from him." *Id*. Along with this argument, Plaintiff emphasizes that his request "is broader than just emails," and that the FBI cannot properly "conclude that the 1A file would contain all records potentially responsive

to Mr. Dillon's request." *Id.* Mr. Dillon thus asserts that, before finding the search adequate, the Court should order the FBI to search all of Dr. Ivins's seized work and home computers (or any mirror images of these computers) or, in the alternative, that the Court must ask the FBI to describe "the universe of Dr. Ivins's emails, including a list of his home, office, and laboratory computers as well as mirror images of them that might have contained his emails." *Id.* at 6–7. For the forthcoming reasons, Defendant has the better argument.

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Jennings v. DOJ*, 230 F. App'x 1, 1 (D.C. Cir. 2007) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). "An agency fulfills its obligations under FOIA . . . 'if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Canning v. United States Dep't of State*, 346 F. Supp. 3d 1, 13 (D.D.C. 2018) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks and citation omitted)); *see also Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007).

For a search to be reasonably calculated to uncover all relevant documents, the agency does not need to search "every record system" for the requested documents. *Marino v. DOJ*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Nor must the agency's search be perfect. *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986). But the agency must show that it "conduct[ed] a good faith, reasonable search of those systems of records likely to possess the requested records." *Pinson*, 177 F. Supp. 3d at 80 (quoting *Marino*, 993 F. Supp. 2d at 9 (internal citation omitted)); *see also Oglesby*, 920 F.2d at 68. To make this showing, "the agency must provide a 'reasonably detailed' affidavit or

declaration describing the agency's actions and the scope of the search." *Dillon I*, 2019 WL

259580, at *5 (quoting *Iturralde*, 315 F.3d at 313–14); *see also Oglesby*, 920 F.2d at 68.

Thereafter, "the burden shifts to the FOIA requester to produce 'countervailing evidence'

suggesting that a genuine dispute of material fact exists as to the adequacy of the search."

*Pinson v. DOJ*, 313 F. Supp. 3d 88, 107 (D.D.C. 2018) (quoting *Morley*, 508 F.3d at 1116).

Here, DOJ's declarations documenting its most recent search carry the agency's burden

to demonstrate that it has conducted the sort of good faith, reasonable search that FOIA

demands. Because the adequacy of a search does not turn on what the agency finds, *see*

*Jennings*, 230 F. App'x at 1, the Court rejects at the outset any allegation by Mr. Dillon that the

search is inadequate simply because the FBI failed to locate any emails in the 1A binders apart

from those that Mr. Dillon had previously identified. Pl.'s Mem. 5 (citing Seidel Decl. ¶ 57).

What matters are the methods that the FBI used to carry out the search. *See Jennings*, 230 F.

App'x at 1. Nor is the operative legal standard whether "*all* the potentially responsive emails in

the FBI's possession" would be located in the 1A binder that the FBI searched. Pl.'s Mem. 5

(emphasis added). Rather, the key question facing this Court is whether the FBI's choice to

search only the 1A attachments associated with the identified binder was "reasonably calculated

to uncover all relevant documents," *Valencia-Lucena*, 180 F.3d at 325 (internal citation omitted),

that Mr. Dillon sought in his narrowed request.

Defendant's submissions to the Court provide "reasonably detailed" declarations

"describing the agency's actions and the scope of the search," *Dillon I*, 2019 WL 249580, at *5

(quoting *Iturralde*, 315 F.3d at 313–14), thereby satisfying DOJ's initial burden. Defendant

states that FBI's WFO identified the 1A file attachments as the "only location where records of

this type (emails received by the FBI from an outside source) would likely be located." Def.'s

Reply 3 (citing Seidel Decl. ¶ 57). And although Plaintiff challenges the adequacy of the search on the grounds that the Defendant has failed to establish that the binder associated with the Compaq Presario Hard Drive, [Redacted Name], 2001 Ivins and [Redacted Name] Email Exchanges, is the only binder that could have contained responsive emails, *see* Pl.'s Mem. 5; Pl.'s Reply in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Reply") 2, ECF No. 47 (challenging agency's choice to search only a single binder, and not the full universe of potentially responsive materials), this line of argument misconstrues what FBI's declaration states. In fact, Defendant avers that it searched "*binders*—plural—that "include three copies of the same collection of emails titled 'Review of Compaq Presario Hard Drive, [Redacted Name], 2001 Ivins and [Redacted Name] Email Exchanges." Seidel Decl. ¶ 57 n.10. Mr. Dillon's contention that the FBI has not searched the relevant universe of binders thus misses the mark.[6]

Nor do Mr. Dillon's other arguments concerning the scope of the FBI's search carry his burden "to produce 'countervailing evidence' suggesting that a genuine dispute of material fact

---

[6] Plaintiff's reply brief also asserts that Defendant's search is inadequate because "the FBI fails to address the question of whether it still possesses multiple *computers* seized from Dr. Ivins." Pl.'s Reply 3 (emphasis in original). Whether or not the FBI has a statutory duty to search any such computers, if they exist, depends on whether they qualify as "agency records" for purposes of a FOIA request. *See* 44 U.S.C. § 552(f) (defining a "record" subject to FOIA disclosure provisions, unless a statutorily specified exemption applies). This issue is not black and white. *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 678 (D.C. Cir. 2016) (noting that FOIA's definition of a "record" "provides little help in understanding what is a 'record' in the first place" and that agencies "in effect define a 'record' when they undertake the process of identifying records that are responsive to a request" (citing 44 U.S.C. § 552(f)(2)). Because neither party has briefed this issue, and because Plaintiff develops this argument for the first time in his reply brief, the Court does not weigh in on whether the computers that Mr. Dillon mentions are themselves agency records (which determines whether FBI had a statutory duty to search any such computers). Rather, the Court rests its determination on its conclusion that, as discussed here, DOJ's submissions discharge the agency's initial burden concerning the adequacy of the search and, as the Court next discusses, Mr. Dillon has not provided non-speculative evidence to rebut the presumption of good faith that the agency is due. *McClanahan*, 712 F. App'x at 8 (quoting *Mobley*, 806 F.3d at 581).

exists as to the adequacy of the search." *Pinson*, 313 F. Supp. 3d at 107 (quoting *Morley*, 508

F.3d at 1116). In challenging the adequacy of the search, Plaintiff insists that the FBI has not

searched all relevant locations, Pl.'s Mem. 5, citing the Amerithrax report summary's discussion

of the Task Force's searches of "home and work computers" and its examination of emails,

which contributed to the FBI's determination that "Dr. Bruce Ivins committed the crime," *id*. at 6

(quoting Ex. 1 at 6, ECF No. 41-1). Though his argument here is not a paragon of clarity, Mr.

Dillon seems to make two points. First, FBI has not stated that it "ingested all emails from both

Ivins's home and work computers which supposedly demonstrate that Dr. Bruce Ivins committed

the crime." *Id*. Second, because Plaintiff's FOIA request is "broader than just emails" and also

seeks "emails showing that Dr. Ivins did *not* commit the crime," the 1A file associated with the

investigation would not necessarily include all relevant materials. *Id*.

Neither point is persuasive. Taking them in reverse order, Mr. Dillon's second point is

unavailing because the narrowed FOIA request *is* in fact limited to emails plus a notebook that

has now been produced. Mr. Dillon's first point also fails because it misconstrues the applicable

legal standard to apply to Defendant's submissions. FBI's declaration explicitly states that any

"images" from Dr. Ivin's computer "would have been maintained in the paper records located in

the 1A attachments to the main investigative file," Def.'s Reply 4 (citing Sept. 2019 Hardy Decl.

¶ 5), such that the FBI's search of the 1A attachments would have located any potentially

responsive emails contained therein. Because the FBI does not need to conduct a "perfect"

search, *Meeropol*, 790 F.2d at 956, of "every record system" for the requested documents,

*Marino*, 993 F. Supp. 2d at 9 (citing *Oglesby*, 920 F.2d at 68), the agency is not required to state

that it ingested the universe of relevant emails into the database that it searched. Rather, it needs

to establish that it conducted a "reasonable search" of the locations "likely to possess the

requested records." *Pinson*, 177 F. Supp. 3d at 80 (quoting *Marino*, 993 F. Supp. 2d at 9 (internal citation omitted)); *see also Oglesby*, 920 F.2d at 68. Defendant's submissions establish precisely that. What Mr. Dillon seems to be saying, at bottom, is that he disagrees with FBI's WFO identification of the 1A file attachments as the "only location where records of this type (emails received by the FBI from an outside source) would likely be located." Def.'s Reply 3 (citing Seidel Decl. ¶ 57). But the FBI "need not knock down every search design advanced by" Mr. Dillon to establish the adequacy of its search. *Dibacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) (citing *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)). Because Mr. Dillon has not provided any non-speculative evidence that would permit the Court to doubt Defendant's claims that it conducted a reasonable search of the locations most likely to contain responsive records, his arguments fall flat.

Rather than present any further, discrete evidence, such as the three unproduced emails that Mr. Dillon pointed to in the prior round of summary judgment briefing, to support his proposition that FBI has not canvassed the relevant set of locations to search, Plaintiff suggests that the FBI may have acted in bad faith. But his arguments here are equally unavailing. Under this Circuit's controlling law, "the presumption of good faith 'cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'" *McClanahan v. DOJ*, 204 F. Supp. 3d 30, 46–47 (D.D.C. 2016) (quoting *Mobley*, 806 F.3d at 581) (internal citation omitted)). Yet many of Mr. Dillon's contentions are exactly this sort of "purely speculative claim" that does not suffice. Consider, for instance, Mr. Dillon's warning to the Court that "the last time the FBI relied on an assumption instead of facts as to where all emails would have been located—in the CRS—it was incorrect." Pl.'s Reply 2. This charge is not nearly enough to sustain the charge of bad faith. Or take Plaintiff's suggestion that the FBI's

treatment of Dr. Ivins's computers, without more explanation, "raise[s] troubling questions about the integrity of the FBI's investigation of Dr. Ivins." *Id.* The problem with this allegation is that, for the reasons described above, Plaintiff's narrowed search request targeted only two specific kinds of information: (1) "Ivins's emails to or from Patricia Fellows and Mara Linscott;" and (2) "Laboratory Notebook No. 4282." Def.'s Mot., Ex. BB. Because the FBI has now produced the notebook, the only remaining issue therein are the emails. And at present, in contrast to his arguments in the prior round of summary judgment briefing, Plaintiff provides no specific reason (e.g., no unproduced, yet publicly available document) to doubt the FBI's sworn attestation that the supplemental search by the WFO included "any locations where responsive email records should be located within the Amerithrax investigative file." Seidel Decl. ¶ 57. Thus, Mr. Dillon's allegations are not enough to rebut the presumption of the FBI's good faith.

Furthermore, the bare fact that the agency did not initially identify the responsive emails is not itself sufficient to establish bad faith. The FBI's initial failure to identify these records in the midst of "over 8,000 1A attachments in the investigative file," Seidel ¶ 57, is, to be sure, a mistake. However, such a mistake is not necessarily a FOIA violation; to the contrary, "it would be unreasonable to expect even the most exhaustive search to uncover *every* responsive file; what is expected of a law-abiding agency is that it admit and correct error when error is revealed." *Meeropol*, 790 F.2d at 953. Where, as here, the agency corrects its error, it has complied with FOIA's demands. *See Ctr. for Journalism v. IRS*, 116 F. Supp. 2d 1, 10 (D.D.C. 2000) (citing *Meeropol*, 790 F.2d at 943 n.5) (finding agency did not act in bad faith where it located and released responsive records that it had, by mistake, initially omitted), *aff'd,* 22 F. App'x 14 (D.C. Cir. 2001). Mr. Dillon's allegations of bad faith thus rest on the speculation that there is more, somewhere out there, amidst the undisclosed universe of potential locations to search, that the

FBI has not searched and has not produced. That is not enough. *See Mobley*, 806 F.3d at 581

(quoting *SafeCard*, 926 F.2d at 1200); *DiBacco*, 795 F.3d at 191 (quoting *Wilbur v. CIA*, 355

F.3d 675, 678 (D.C. Cir. 2004)).

Accordingly, because Defendant has established the adequacy of its supplemental search

and Plaintiff has not established that a "genuine dispute of material fact exists as to the adequacy

of the search," *Pinson*, 313 F. Supp. 3d at 107 (quoting *Morley*, 508 F.3d at 1116), the Court

grants Defendant's motion for summary judgment and denies Plaintiff's cross-motion with

respect to the adequacy of the search for documents responsive to the first FOIA request. If Mr.

Dillon seeks further records beyond the scope of his narrowed request, he remains free to pursue

a new FOIA request.

### 2. Challenge to Application of FOIA Exemptions

In addition to contesting the adequacy of the FBI's latest search, Plaintiff's cross-motion

for summary judgment challenges for the first time the agency's application of FOIA exemptions

to the records that it has produced in response to his first FOIA request. As the Court mentioned

previously, after this Court's order in *Dillon I*, the FBI located and processed a total of 343 pages

of potentially responsive additional email records. Fourth Hardy Decl. ¶ 4. Defendant withheld

in full 241 pages that were "duplicative of other documents accounted for in the FBI's

production." *Id*. The remaining 102 pages were then released with partial redactions pursuant to

FOIA Exemptions b(6) and b(7)(C). *Id.* Defendant justifies these redactions by providing a

*Vaughn* Index along with a declaration in support of the motion by RIDS Acting Section Chief

Michael Seidel. *See* Def.'s Mem. P. & A. Supp. Renewed Mot. for Summ. J. ("Def.'s Mem.")

13, ECF No. 38-1. The Seidel Declaration states that the records at issue were compiled for a

specific law enforcement purpose—"the FBI's investigation of bioterrorism attacks," Seidel

Decl. ¶ 64—and that, "[i]n each instance where information was withheld pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI determined the individuals' privacy interests outweighed the public interest in the information," *id.* ¶ 66.

Plaintiff contends that the agency's justifications for applying these exemptions are lacking. Pl.'s Mem. 11. Mr. Dillon makes two specific objections.[7] First, he argues that the FBI has not justified its basis for "withholding the names and/or identifying information of third parties merely mentioned" in the FBI's investigatory materials. *Id.* Mr. Dillon emphasizes that, although the FBI's declaration "made reference to the [agency's] reasons" for withholding this material, Pl.'s Reply 4, Defendant's opening brief for summary judgment "never specifically addresses the agency's justification" for these redactions. Pl.'s Mem. 12. Citing *Shapiro v. DOJ*, 239 F. Supp. 3d 100, 119 n.6 (D.D.C. 2017), Mr. Dillon urges the Court to "disregard [such an] argument made only in the declaration." Pl.'s Reply 4. Second, Plaintiff asserts that the FBI has improperly applied what amounts to a categorical exemption to FBI and non-FBI federal employees, thereby contravening this Circuit's instruction that Exemption 7(C) requires a fact-specific analysis. Pl.'s Mem. 14 (citing *Stern v. FBI*, 737 F.2d 91, 93 (D.C. Cir. 1984)). For

---

[7] Mr. Dillon also makes a third argument concerning the FBI's application of Exemptions 6 and 7(C) that involves the public's interest in receiving information about third parties of investigative interest to the FBI. *See* Pl.'s Mem. 14–16. This argument references "Exemptions 6/7(C)-4," *id.* at 14, which is a reference to the coding scheme used in DOJ's *Vaughn* Index. The *Vaughn* Index associated with the first FOIA request, Number 1327397, does not mention third parties of investigative interest and only uses three categories: (b)(6)-1 and (b)(7)(C)-1 (referring to "Names and/or Identifying Information of Third Parties Merely Mentioned"); (b)(6)-1 and (b)(7)(C)-2 (referring to "Names and/or Identifying Information of FBI Special Agents/Support Personnel"); and b(6)-1 and b(7)(C)-3 (referring to "Names and/or Identifying Information of Non-FBI Federal Government Personnel"). Def.'s Mot., Ex. GG, *Vaughn* Index for FOIPA Request No. 1327397, ECF No. 38-3 at 95. The Court thus infers that this fourth category does not apply to the first FOIA request, making Plaintiff's arguments on this front inapposite here.

the forthcoming reasons, Defendant has justified its invocation of FOIA exemptions and Plaintiff's arguments to the contrary fall flat.

Under FOIA, the government agency carries the burden to justify its withholding of any requested material. *See* 5 U.S.C. § 552(a)(4)(B); *see also Nat. Res. Def. Council v. NRC*, 216 F.3d 1180, 1190 (D.C. Cir. 2000) ("FOIA itself places the burden on the agency to sustain the lawfulness of specific withholdings in litigation."). To satisfy this burden, "an agency may rely on detailed affidavits, declarations, a *Vaughn* index, in camera review, or a combination of these tools." *Elec. Frontier Found. v. DOJ*, 57 F. Supp. 3d 54, 59 (D.D.C. 2014) (quoting *Comptel v. FCC*, 910 F. Supp. 2d 100, 111 (D.D.C. 2012)). Ultimately, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder v. CIA*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Judicial Watch*, 715 F.3d at 941 (internal citations omitted)); *see also Wolff v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)). But "exemptions from disclosure must be narrowly construed," and "[c]onclusory and generalized allegations of exemptions" do not provide sufficient justification. *Morley*, 508 F.3d at1114–15 (internal citations omitted); *see also Pinson*, 313 F. Supp. 3d at 106.

The exemptions at issue with respect to the first FOIA request are Exemption 6 and Exemption 7(C), both of which operate to protect personal privacy interests. Exemption 6 applies to information about individuals in "personnel and medical and similar files" when that information, if disclosed, "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records or information compiled for law enforcement purposes," and which, if disclosed, "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). Both Exemption 6 and Exemption

7(C) require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information." *Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993); *see also Davis v. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).

Although balancing of privacy and public interests is required in the context of both Exemption 6 and 7(C), "Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (internal quotation marks and citation omitted); *see also U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 496 n.6 (1994) ("Exemptions 7(C) and 6 differ in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions."); *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011) (making similar comparison). Because "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6," *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989), "the balance tilts more strongly toward nondisclosure in the context of Exemption 7(C)." *Braga v. FBI*, 910 F. Supp. 2d 258, 267 (D.D.C. 2012) (quoting *Reporters Comm.*, 489 U.S. at 756); *see also 100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 159 (D.D.C. 2017) (discussing broader language of Exemption 7(C) as compared to Exemption 6). "Accordingly, if the documents withheld and information redacted were 'compiled for law enforcement purposes,' the Court need engage only in an analysis of whether the defendant properly redacted information and withheld documents pursuant to Exemption 7(C)." *100Reporters LLC*, 248 F. Supp. 3d at 159 (citing *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 541 (D.C. Cir. 2014); *Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011); *Rodriguez v. U.S. Dep't of the Army*, 31 F. Supp. 3d 218, 231 (D.D.C. 2014).

The agency states that all of the records at issue here—emails between Dr. Ivins and other individuals—were "compiled for law enforcement purposes only" because the FBI compiled them "in connection with [its] investigation of bioterrorism attacks," including its specific investigation into Dr. Ivins. Seidel Decl. ¶ 64; *see also* Def.'s Mem. 25. The Court finds that these submissions satisfy Defendant's burden to establish that the records were compiled for law enforcement purposes and thereby fall within Exemption 7(C)'s scope, and Plaintiff at no point challenges this characterization. Thus, the Court will analyze these records only under Exemption 7(C).

Exemption 7(C)'s "statutory direction that the information not be released if the invasion of personal privacy could reasonably be expected to be unwarranted requires the courts to balance the competing interests in privacy and disclosure." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004); *see also Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 876 F.3d 346, 349 (D.C. Cir. 2017) (quoting *Favish*, 541 U.S. at 171). This balancing occurs in several steps. First, the court must determine whether an individual has "a privacy interest in the information to be disclosed." *100Reporters LLC*, 248 F. Supp. 3d at 161–62 (citing *ACLU v. DOJ*, 655 F.3d 1, 6–7 (D.C. Cir. 2011)); *see also* FOIA Update, Vol. X, No. 2, at 7 (stating that the first step of the analysis is to "determine whether disclosure would threaten a personal privacy interest"). The court proceeds to a second step only if it identifies such a privacy interest; if so, then the court "balance[s] the individual's privacy interest against the public interest, considering only the public interest 'that focuses on the citizens' right to be informed about what their government is up to.'" *100Reporters LLC*, 248 F. Supp. 3d at 161–62 (quoting *Davis*, 968 F.2d at 1282); *see also Reporters Comm.*, 489 U.S. at 773, 775 (establishing that an identified public interest must fall within FOIA's "core purpose"—to "shed[] light on an

agency's performance of its statutory duties"—to qualify). In a reversal of the typical burden of

persuasion with respect to FOIA exemptions, the requester carries the burden of showing both

(1) that the "public interest sought to be advanced is a significant one" that is "more specific than

having the information for its own sake" and (2) that the information sought "is likely to advance

that interest." *Favish*, 541 U.S. at 172.

Individual privacy interests are heightened in the context of law enforcement files,

wherein the very "mention of an individual's name . . . will engender comment and speculation

and carries a stigmatizing connotation." *Roth*, 642 F.3d at 1174 (quoting *Schrecker v. DOJ*, 349

F.3d 657, 666 (D.C. Cir. 2003)). Exemption 7(C) thus implicates substantial privacy interests for

categories of individuals such as "targets of law enforcement investigations, potential

defendants, witnesses, informants, and investigators." *100Reporters LLC*, 248 F. Supp. 3d at

162 (citing *SafeCard*, 926 F.2d at 1205). Indeed, under the controlling law of this Circuit, there

is "a categorical rule permitting an agency to withhold information identifying private citizens

mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or

refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker*, 349 F.3d

at 661 (quoting *SafeCard*, 926 F.2d at 1206).

Here, FBI applies Exemption 7(C) to justify its redaction of the names and/or identifying

information of three categories of individuals: (1) "third parties merely mentioned, both within

the Bruce Ivins laboratory notebook and within the emails between him and his colleagues,"

Seidel Decl. ¶ 67; (2) FBI personnel, *id.* ¶ 69; and (3) non-FBI federal government personnel

who were "acting in their official capacities and aided the FBI" in its law enforcement

investigation, *id.* ¶ 71. The Court next considers the application of the exemption to each group.

First, however, it is necessary to clear the brush of one threshold point. As the Court mentioned, Mr. Dillon contends that DOJ's discussion of the first category of individuals for whom the FBI invokes Exemption 6 and Exemption 7(C)—"third parties merely mentioned"—only in Defendant's supporting declaration, and not in the text of its opening brief, precludes the Court's consideration of Defendant's arguments with respect to this category of individuals. *See* Pl.'s Reply 4. Plaintiff's contentions are unpersuasive. As a matter of law, an agency invoking an exemption may rely on declarations to make precisely this sort of informational showing under FOIA—as Defendant notes. *See* Def.'s Reply 6 n.2 (citing *Hardy v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017)). In fact, it is the routine practice of courts in this circuit to award summary judgment in a FOIA case "*solely* on information provided in an agency's supporting affidavits or declarations," so long as those declarations "describe 'the documents and the justifications for nondisclosure with reasonably specific detail . . . and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith.'" *Johnson v. United States*, 239 F. Supp. 3d 38, 42 (D.D.C. 2017) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)) (emphasis added); *see also, e.g.*, *Pinson*, 236 F. Supp. 3d at 353; *Citizens for Ethics & Responsibility in Wash. v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (citing *Military Audit Project*, 656 F.2d at 738). Here, by moving for summary judgment concerning all of its Exemption 7(C) withholdings, *see* Def.'s Mem. 26, including an explanation of its overall balancing of privacy interests, *id.* at 26–27, DOJ raised the legal argument that it had carried its burden regarding this FOIA exemption. It then, as the law of this Circuit permits, sustained these claims by submitting declarations. Thus, the question for the Court is whether the information presented in the record, including the parties' briefs, the FBI's supporting declarations, and any undisputed material

facts, justify granting summary judgment.[8]  *See Winston & Strawn, LLP v. McLean*, 843 F.3d

503, 505 (D.C. Cir. 2016) (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir.

2015) (Griffith, J., concurring), and citing Fed. R. Civ. P. 56(e)(3)).  For the following reasons,

the Court finds that Defendant has carried its burden in this instance.

### a.  Application of Exemption 7(C) to "Third Parties Merely Mentioned"

The first category of individuals for whom the FBI applied Exemption 7(C) is "third

parties merely mentioned."  This category refers to individuals who are "not of investigative

interest to the FBI;" rather, they are "private citizens" who "were at one time connected with an

FBI investigation."  Seidel Decl. ¶ 67.  Under this Circuit's controlling law, an agency may

"withhold 'the names and addresses of private individuals appearing in files within the ambit of

Exemption 7(C) [unless disclosure] is necessary in order to confirm or refute compelling

evidence that the agency is engaged in illegal activity.'" *Nation Magazine*, 71 F.3d at 896

(quoting *SafeCard*, 926 F.2d at 1206).  In this instance, the FBI has withheld the names of "third

---

[8] The single district court case that Mr. Dillon invokes in furtherance of his argument, *Shapiro*, 239 F. Supp. 3d 100, does not dictate a contrary conclusion.  In *Shapiro*, the FBI's declaration contained "*extensive* legal argument," *id.* at 119 n.6 (emphasis added), advancing the agency's stance on the parties' threshold dispute concerning the scope of the "risk of circumvention" requirement, as a matter of law, in the context of FOIA Exemption 7(E), *id.* at 119.  In this case, the information presented in the FBI's declaration involves the agency's rationale for applying Exemption 7(C) to withhold information concerning "third parties merely mentioned"—not, as in *Shapiro*, its defense of the scope of the exemption in the face of the requester's contention that the exemption operates differently as a matter of controlling law.  The material contained in the FBI's declaration here, in other words, primarily involves the agency's arguments concerning why, as a factual matter, there are privacy interests at stake, and not why, as a legal matter, the exemption should be read a particular way.  *See* Seidel Decl. ¶¶ 67–68.  Plaintiff's argument thus conflates legal argumentation concerning the manner in which to apply an exemption with information concerning the agency's justification for application of that exemption.  Furthermore, the Court notes that, as a practical matter, Plaintiff had the opportunity to respond to the arguments in Defendant's reply in its own reply in support of Plaintiff's cross motion.  *Cf. Shapiro*, 239 F. Supp. 3d at 119 n.6 (considering arguments raised in FBI's declaration to which plaintiff had fully responded).

parties merely mentioned, both within Bruce Ivins['s] laboratory notebook and within the emails between him and his colleagues." Seidel Decl. ¶ 67; *see also* Def.'s Mot., Ex. GG, *Vaughn Index* for FOIPA Request No. 1327397. In addition, the FBI has redacted certain other personal information about these third parties, including "personal medical information," "career-related activities," "marital issues," "other family matters, and other topics completely unrelated to the Amerithrax investigation." Seidel Decl. ¶ 67. Because Mr. Dillon presents no evidence that disclosure of the names of these private citizens is necessary to address "compelling evidence" of the FBI's illegal activity, these redactions plainly fall within *SafeCard*'s categorical exemption insofar as the FBI has applied them only to private citizens who are not government employees. *See Nation Magazine*, 71 F.3d at 896. Indeed, even Plaintiff seems to recognize as much. Pl.'s Mem 13 (acknowledging "*SafeCard* rule" with respect to "private individual[s]").

Furthermore, Plaintiff provides no reason to question the agency's statement that disclosure of the other withheld information about these private citizens "would expose highly personal information for public consumption and would undoubtedly result in invasions of personal privacy." Seidel Decl. ¶ 67. Thus, the Court finds these redactions proper insofar as they are applied to records that discuss private individuals who are not government employees. *See Favish*, 541 U.S. at 165 ("The concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea. Records or information are not to be released under FOIA if disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.'" (first quoting *Nat'l Reporters Comm.,* 489 U.S. at 763, then quoting 5 U.S.C. § 552(b)(7))).

However, DOJ is at times too quick to suggest that the asserted privacy interests of individuals "merely mentioned" are the same regardless of whether the individuals are private

citizens or government personnel.  *See* Def.'s Mem. 27–28.  As Defendant explains, among the individuals whose information was redacted in the category of "third parties merely mentioned" are government personnel who appear in contexts such as "emails that are personal in nature," often with "one party . . . sending/receiving emails from a personal email account."  Sept. 2019 Hardy Decl. ¶ 7.  In short, they are government personnel who are not "conducting official government work" and are instead appearing in the records in a personal context.  *Id.*  Mr. Dillon protests the agency's application of the same exemption, under the same rationale, to "both private individuals and federal employees."  Pl.'s Mem. 13.  In response, Defendant retorts that it is not invoking the same *SafeCard* analysis with respect to federal employees in this category, but rather redacted personal information because "the privacy interest of civilian federal employees includes the right to control information related to themselves and to avoid disclosures that 'could conceivably subject them to annoyance or harassment in either their official or private lives.'"  Def.'s Reply 7–8 (quoting *Lesar v. DOJ*, 636 F.2d 472, 487 (D.C. Cir. 1980) (citing *Nix v. United States*, 572 F.2d 998, 1006 n.8 (4th Cir. 1978)).

Here, Defendant has established that there is a distinct privacy interest for this sub-category of individuals. Although Defendant's initial briefing blurred these issues—as Plaintiff notes, *see* Pl.'s Mem. 12—DOJ's subsequent briefing clarifies the privacy interests that pertain to this category of federal employees who are "merely mentioned" in a personal, not professional, context.  Contrary to Plaintiff's contentions that the FBI applied the same "categorical" *SafeCard* rule to exempt information about these employees, *id.* at 13, "the FBI consider[ed] its withholdings in the specific context of whether an employee [was] acting in a private capacity," Def.'s Reply 8 (citing Sept. 2019 Hardy Decl. ¶ 7).  Thus, rather than apply any categorical analysis, the FBI conducted a case-specific analysis of these individuals' privacy

interests, which it found to be more akin to those of private individuals (and not government employees acting in their official capacities). *Id.* at 7. The Court agrees with the core part of Defendant's argument: a government employee who is mentioned in a personal communication in the context of a law enforcement investigation, outside of her official capacity and outside of the context of any official government business, has at least a minimal privacy interest in this personal information.[9] *See Stern*, 737 F.2d at 91 (conducting context-sensitive analysis of federal employees' privacy interests). The key analytic point is that whether the agency may choose not to disclose the information is not a categorical matter, as it is under *SafeCard* for private citizens. Instead, it requires balancing of the privacy interests of the individual against the public's interest in disclosure of the information—the topic to which the Court next turns.

The balancing in this case is straightforward because Plaintiff never establishes a public interest in disclosure of the information. Mr. Dillon attacks the agency's submissions as deficient for the failure to adequately distinguish between "mere mentions of both private individuals and federal employees," Pl.'s Mem. 13, focusing entirely on what the FBI has failed to do. But in so doing, Plaintiff fails to carry his own burden with respect to Exemption 7(C). *See Favish*, 541 U.S. at 172 (discussing requester's burden). The closest that Mr. Dillon comes is his citation to *Stern*, which notes that "the status of individuals . . . as federal employees diminishes their privacy interests . . . because of the corresponding public interest in knowing how public employees are performing their jobs[.]" Pl.'s Mem. 13 (quoting *Stern*, 737 F.2d at 92). But this invocation of an abstract public interest is unavailing for two reasons. First, Plaintiff never says anything more about why, given the FBI's statement that all of these

---

[9] The Court reserves judgment on whether such an individual's privacy interest is on a par with that of a similarly-situated private citizen who is not a government employee, which it need not decide to reach this conclusion.

individuals were involved in purely personal communications, the information at issue has anything to do with public employees' job performance. Second and even more significantly, the requester must both show that the (1) "public interest to be advanced is a significant one" that is "more specific than having the information for its own sake" and (2) that the information sought "is likely to advance that interest." *Favish*, 541 U.S. at 172. Because Mr. Dillon has said nothing at all about the nature of the public interest, he has not carried this burden. And having shown no "public interest in disclosure," this Court "need not linger over the balance" between the agency's asserted privacy interests in the requested material and Mr. Dillon's abstract appeals to the public interest; "something, even a modest privacy interest, outweighs nothing every time." *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

Accordingly, Defendant's motion for summary judgment on the application of Exemptions 6 and 7(C) to "third parties merely mentioned" is granted.[10]

> *b. Application of Exemption 7(C) to FBI and Non-FBI Federal Employees*[11]

The FBI has also applied Exemption 7(C) to withhold the names and/or identifying information of (1) FBI special agents or support personnel who were involved in the Amerithrax

---

[10] The application of these exemptions is coterminous. *See* Ex. GG, *Vaughn* Index for FOIPA Request No. 1327397. Although Plaintiff does not argue that Defendant failed to segregate this particular withheld material from non-exempt portions of the records produced, the Court is required to "make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citations omitted); *see also* 5 U.S.C. § 552(b). The Court grants this motion having considered the agency's *Vaughn* Index and sworn statement that the FBI's segregability review led it to conclude that "there is no further non-exempt information that can be reasonably segregated and released." Seidel Decl. ¶ 114.

[11] Because the parties make arguments about both of these groups together, *see* Pl.'s Mem. 14; Def.'s Reply 8, and because Defendant states that "[t]he rationale for protecting non-FBI federal support personnel is the same as for FBI support personnel," Seidel Decl. ¶ 71, the Court considers these two categories of individuals together despite the fact that separate *Vaughn* Index codes are used for each group.

investigation, Seidel Decl. ¶¶ 69–70, and (2) non-FBI federal government personnel who "aided the FBI in the law enforcement investigative activities" at issue in this suit, *id.* ¶¶ 71–72. Defendant maintains that the disclosure of this information would risk making these individuals into "targets of harassing inquiries for unauthorized access to FBI investigations," *id.* ¶ 69, and/or would otherwise risk "subject[ing] them to unauthorized inquiries and harassment that would constitute a clearly unwarranted invasion of their personal privacy," *id.* ¶ 71. Plaintiff rejects this asserted privacy interest and argues that these redactions are improper because the names of such individuals are not "categorically exempt" and the FBI has engaged in unjustified, "*per se* rules of nondisclosure" rather than accounting for "variation among the individual records or persons falling within it." Pl.'s Mem. 14 (first quoting *Stern*, 737 F.2d at 91, then quoting *Am. Immigration Lawyers' Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 675 (D.C. Cir. 2016)). For the forthcoming reasons, Defendant has the better argument.

"To determine whether disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy' for purposes of Exemption 7(C)" requires "balanc[ing] the privacy interests that would be compromised by disclosure against the public interest in release of the requested information.'" *Roth*, 642 F.3d at 1174 (quoting *Davis,* 968 F.2d at 1281). Here, the privacy interests are clear. The FBI's declarations submitted in support of its motion for summary judgment state that the individuals for whom it has redacted information either "are/were in positions of access to sensitive and classified information regarding the investigation" (in the case of FBI personnel), Seidel Decl. ¶ 69, or "aided the FBI" in its "law enforcement investigative activities" (in the case of non-FBI federal government personnel), *id.* ¶ 71. Courts in this Circuit have repeatedly recognized the "'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged criminal activity.'" *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (quoting *Stern*, 737 F.2d at 91-92);

*see also Roth*, 642 F.3d at 1174 ("As we have "long recognized,' the 'mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.'" (quoting *Schrecker,* 349 F.3d at 666)).  Based on the FBI's submissions to this Court, it is evident that all of the individuals in the categories at issue here were directly involved in the FBI's investigation regarding Dr. Ivins and, accordingly, have a strong privacy interest.

In the face of this strong privacy interest, Plaintiff's arguments fail to provide any counterbalancing considerations.  The only specific point that Plaintiff raises is the contention that "the FBI used a *per se* rule where it redacted each and every mention of the name or identifying information of federal employees."  Pl.'s Reply 4.  In furtherance of this point, Mr. Dillon relies on *Stern* for the proposition that Exemption 7(C) requires the FBI to establish what "specific facts reflected in the record" justify its application.  *Stern*, 737 F.2d at 91.  Mr. Dillon contends that, given the FBI's failure to provide "specific facts related to any individual federal employee," it has applied what amounts to a categorical exemption that is inconsistent with controlling law.  Pl.'s Reply at 5.

Plaintiff's argument, however, misconstrues both what the FBI did and what *Stern* as well as the other controlling law of this Circuit require.  The first issue is Plaintiff's mischaracterization of the FBI's application of the exemption.  On Mr. Dillon's account, the fact that the FBI found it proper to redact all of the names of individuals who were similarly situated amply supports the inference that the agency applied a categorical rule in one step.  In fact, though, it equally supports the inference that, just as Defendant states, the FBI's first step of analysis considered the manner in which "these employees were acting in their official capacities and aid[ing] the FBI" in its investigation, thereby creating a "clearly unwarranted invasion of their personal privacy."  Def.'s Reply 8 (citing Seidel Decl. ¶ 71).  Then, its second step "concluded that the release of this information would not significantly increase the public's understanding of FBI operations or activities."  *Id.* at 8–9 (citing Seidel Decl. ¶ 72).  Finally, in the FBI's third step, the agency

considered the balance of private and public factors and concluded that it was most appropriate to withhold the information to avoid "subject[ing] government personnel to scrutiny while failing to show how such personnel contributed to the FBI's duties with respect to Dr. Ivins." *Id.* at 9 (citing *Lesar*, 636 F.2d at 497–88). Plaintiff presents no legal argumentation or countervailing facts to discredit the FBI's submissions regarding the asserted privacy interest or its balancing analysis.

The second and even more basic deficiency in Plaintiff's argument is that Mr. Dillon fails to articulate any competing public interest with respect to the specific information he seeks for these individuals, as Defendant notes. *See* Def.'s Reply 9 ("Dillon does not . . . explain what, if any, public interest would be served by the release of this information."). In so doing, Mr. Dillon looks right past an equally central lesson of *Stern* (again, the sole case he invokes in support of his argument): the court's explanation that it had identified a "public interest in the disclosure of the identities of the censured employees . . . . in order to hold the governors accountable to the governed." 737 F.2d at 92 (citing *Baez v. DOJ,* 647 F.2d 1328, 1339 (D.C. Cir. 1980)). The *Stern* court took care to distinguish this public interest, which arose in the context of a case involving the alleged impropriety of federal employees, "from other public interests that may arise in requests for disclosure of government investigatory records," such as "an interest in knowing that a government investigation itself is comprehensive, that the report of an investigation released publicly is accurate, that any disciplinary measures imposed are adequate, and that those who are accountable are dealt with in an appropriate manner." *Id.* The more generalizable lesson, and the one that is relevant in the case at hand, is that the Exemption 7(C) balancing test demands identification of a context-specific public interest. And for a requester to carry his burden with respect to the identification of such a public interest, he must specifically establish that the "interest to be advanced is a significant one," and that the information he seeks "is likely to advance that interest." *Favish*, 541 U.S. at 172. The problem for Plaintiff is that, by saying

nothing about the public interest at issue in this instance, he has met none of these requirements. As the Court previously discussed, where, as here, the agency has established a strong privacy interest with respect to the withheld information, this omission alone is sufficient to find the application of Exemption 7(C) justified. *See Nat'l Ass'n of Retired Fed. Employees*, 879 F.2d at 879.

Accordingly, the Court grants Defendant's motion for summary judgment on its application of Exemptions 6 and 7(C) to both FBI personnel and non-FBI government employees acting in the scope of their duties.[12]

### B. The Second FOIA Request

The Court next considers Mr. Dillon's second FOIA request for the 22-page table of contents ("TOC") and the 16 pages discussing Dr. Ivins in the FBI's IMCS report. Mr. Dillon challenges the application of FOIA exemptions to withhold in full these 38 pages of the report, which the FBI claims is protected in its entirety under the deliberative process privilege. *See* Fourth Hardy Decl. ¶ 7 ("The FBI considers the IMCS a deliberative process privileged product."). As noted previously, in *Dillon I*, this Court hesitated to conclude that the deliberative process privilege necessarily shielded the document in its entirety. 2019 WL 249580, at *8 ("The deliberative process privilege does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." (quoting *Loving*, 550 F.3d at 38)). Thus, the Court directed DOJ to produce the withheld

---

[12] The application of these exemptions is coterminous. *See* Ex. GG, *Vaughn* Index for FOIPA Request No. 1327397. Again, although Plaintiff does not argue that Defendant failed to segregate this particular withheld material from non-exempt portions of the records produced, the Court is required to consider segregability. *See Sussman*, 494 F.3d at 1117. Having considered the agency's *Vaughn* Index and its sworn statement that the FBI's segregability review led it to conclude that "there is no further non-exempt information that can be reasonably segregated and released," Seidel Decl. ¶ 114, the Court concludes that Defendant has released all reasonably segregable, non-exempt material.

material for *in camera* review.  *Id.*  For the following reasons, although the Court does not

endorse a "categorical Exemption (b)(5) on the IMCS" in its entirety in the manner that

Defendant urges, Seidel Decl. ¶ 75, the Court does conclude that the FBI may withhold the 38

pages of the report at issue pursuant to this privilege.

As a threshold point, because both parties overread what the Court actually decided in

*Dillon I*, it is important to clarify what remains to be determined now.  Plaintiff and Defendant

each seem, at times, to take the position that the Court already held that the deliberative process

privilege could not shield the withheld material in full.  *See* Pl.'s Cross-Mot. 12 n.1 ("The FBI

reasserts Exemption 5 as to the entirety of the IMCS, but this Court has already denied the FBI's

motion for summary judgment on that basis." (citing Seidel Decl. ¶ 76)); Def.'s 6 n.1 ("In light

of the Court's prior decision denying the FBI's categorical application of Exemption 5 to the

[IMCS], Dillon does not rehash those arguments in his opposition.  The FBI follows suit[.]").

*But see* Def.'s Mot. 20–22 (reiterating previous argument "maintaining that Exemption 5 applies

to the information contained in the IMCS").  Not so.  In *Dillon I*, the Court reserved judgment

concerning the deliberative process privilege and determined that *in camera* review was required

to assess whether there was any "non-privileged factual information" that the government could

properly segregate and disclose, as FOIA demands.  2019 WL 249580, at *8 (first quoting

*Loving*, 550 F.3d at 38, then citing 5 U.S.C. § 552(b)).  For the following reasons, having

conducted this *in camera* review, the Court now concludes that the deliberative process privilege

shields the 38 pages at issue here.[13]

---

[13] Because of the parties' interpretation of the Court's prior opinion, apart from
Defendant's opening motion, neither Plaintiff nor Defendant develop arguments concerning the
deliberative process privilege in their filings here.  Thus, the Court looks to the points raised in
the earlier round of summary judgment briefings to discern the parties' stances, reassessing these
arguments in light of its own *in camera* review of the relevant materials.

In this case, the parties' arguments focus on two issues: (1) whether or not the IMCS is "deliberative" in the manner that FOIA Exemption 5 demands, and (2) whether the material may be protected in full pursuant to Exemption 5. DOJ invokes the privilege on the grounds that the IMCS is "a preliminary case summary drafted midway through the anthrax investigation" and which, accordingly, "contains information, analyses, and suppositions based on the limited and incomplete evidence available at the time." Def.'s Mem. 21 (citing Seidel Decl. ¶ 76). The agency explains, moreover, that the table of contents is "part and parcel to the entire IMCS," and, like the rest of the material, "inherently deliberative." *Id.* at 20–21 (citing Seidel Decl. ¶ 76). Defendant maintains that it cannot segregate the "facts from the deliberations" in these materials "without resulting in harm." *Id.* The FBI avers that several harms would flow from the material. The agency focuses, first, on how the release of "assessments, opinions, recommendations, and analyses by the FBI and USPS based on incomplete evidence partially through the investigation" would "inhibit inter-agency communications and stifle information-sharing." *Id.* (citing Seidel Decl. ¶ 77). The agency also maintains that, because the preliminary version of the IMCS "does not reflect final agency conclusions," and because the 2006 IMCS differs from the final version released to the public in 2010, "[r]eleasing pre-decisional information like the 2006 IMCS would create public confusion." *Id.* (citing Seidel Decl. ¶ 77). In other words, Defendant urges that the IMCS is deliberative because it reflects the preliminary assessments of individuals within the agency about the investigation, which the FBI subsequently refined before releasing its 2010 Investigative Report. *Id.* Defendant further argues that FBI could not segregate "the facts from the deliberations without resulting in harm," Seidel Decl. ¶ 76, and thus invokes the privilege with respect to the document in its entirety.

Plaintiff sees it, unsurprisingly, rather differently. Mr. Dillon presents several discrete arguments in support of his contention that DOJ has not adequately justified either (1) its application of the privilege in the first instance or (2) its withholding of the IMCS pages in their entirety. First, he asserts that the FBI's mere description of the IMCS as an "interim investigative summary" cannot, without further description of "any deliberative process involved in the Anthrax investigation," sustain the agency's claim of the privilege. Pl.'s P. & A. in Support of Cross Mot. for Summ. J. and Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s First Mem. P. & A.") 11, ECF No. 16-1. Second, Mr. Dillon maintains that DOJ has not indicated what "policy matter" the investigation involves, such that the material is not deliberative. *Id.* Finally, Mr. Dillon attacks the application of the privilege to "a great deal of factual information in the document," *id.* (citing Hardy Decl. ¶ 65), that Plaintiff contends is properly subject to disclosure, *id.* at 11–12. Mr. Dillon emphasizes, in particular, that Defendant's filings fail to explain why the 22-page table of contents "is not wholly factual." *Id.* at 11.

Although the Court is sympathetic to Plaintiff's claims and recognizes the importance of "confin[ing] exemption (b)(5) 'as narrowly as [is] consistent with efficient Government operation,'" *Senate of the Com. of Puerto Rico v. DOJ*, 823 F.2d 574, 584 (D.C. Cir. 1987) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980)), based on the Court's *in camera* review of the withheld material in context, Defendant has the better argument. The Court will summarize the relevant legal principles before returning to its substantive discussion.

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption thus "incorporates the traditional privileges that the

Government could assert in civil litigation against a private litigant"—including, as relevant here, "the deliberative process privilege." *Brown v. U.S. Dep't of State*, 317 F. Supp. 3d 370, 376 (D.D.C. 2018) (quoting *Loving*, 550 F.3d at 37 (internal quotation mark and citation omitted)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006).

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Loving*, 550 F.3d at 38 (quoting *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). It aims to "prevent injury to the quality of agency decisions," *Sears*, 421 U.S. at 133, and "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," *Klamath Water Users Protective Ass'n*, 532 U.S. at 8–9. The privilege thus balances the merits of transparency against the concern that agencies will be "forced to operate in a fishbowl." *Petroleum Info. Corp. v. DOI*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

For the deliberative process privilege to apply, the record must "bear on the formulation or exercise of agency policy-oriented judgment." *Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis removed). To qualify, the record at issue must be both predecisional and deliberative. *See Prop. of the People*, 330 F. Supp. 3d at 382. To be predecisional, a record must be antecedent to the adoption of an agency policy. *See Access Reports v. DOJ*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). Although "the term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" it essentially means "that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014). The agency bears the burden of showing that the

privilege properly applies.  *See Dillon I*, 2019 WL 249580, at *8 (citing *Prop. of the People*, 330 F. Supp. 3d at 380).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Id.* (quoting *Wolff*, 473 F.3d at 374–75 (internal quotation marks and citation omitted)).

In this case, the Court notes at the outset that, although the parties focus their attention on whether the IMCS is deliberative in the way that Exemption 5 demands, what matters at bottom is a distinct question: the IMCS's role in the FBI's deliberative *process*.  *Mead Data Cent.*, 566 F.2d at 256 ("Exemption five is intended to protect the deliberative process of government and not just deliberative material." (citing *Montrose Chemical Corp. v. Train*, 491 F.2d 63, 68–71 (1974)).  It is this issue that speaks to both (1) whether, in context, the material in the withheld pages is deliberative as that term is defined under the FOIA, *see Access Reports v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) ("The word 'deliberative' as used in the law of Exemption 5 is considerably narrower than the colloquial meaning."), and (2) whether, accepting that there is deliberative (and thus protected) discussion in the IMCS, there is factual material that must be segregated and disclosed, *see Morley*, 508 F.3d at 1127 ("The deliberative process privilege does not . . . protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.").  It is with this deliberative process framing in mind that the Court approaches the IMCS.

Here, the relevant deliberative process is clear: the IMCS reflects the compilation and distillation of "input" to "aid[] the investigators in making appropriate decisions to progress the FBI's investigation."  Second Hardy Decl. ¶ 12, ECF No. 20-1 (citing First Hardy Decl. ¶¶ 80–81, ECF No. 14-1).  The document was, more precisely, created in 2006 as an "[*i*]*nterim* report

for leadership in the FBI, the United States Postal Service, and Department of Justice to detail the evidence and deliberations of investigators at the time." *Id.* (emphasis in original). Off the bat, then, the FBI's clear statement of the agency's reliance on the document for its own decision-making process is a strike against Plaintiff's contention that Defendant fails to identify any relevant deliberative process. *See* Pl.'s First Mem. P. & A. 11. Because there is no reason to doubt the FBI's uncontroverted assertions concerning the role that this document played in its investigation, and based on its own review of the material, the Court finds the FBI's argument concerning the relevant deliberative process "logical or plausible." *Dillon I*, 2019 WL 249580, at *8 (quoting *Wolf*, 473 F.3d at 374–75 (D.C. Cir. 2007) (internal quotation marks and citation omitted)).

Plaintiff's insistence that FBI has not adequately described the harm threatened by disclosure, *see* Pl.'s First Mem. P. & A. 11–12, is equally unavailing. This Circuit has made clear that, in the context of FOIA's deliberative process privilege, the threatened harm from release is clear from the face of the statute itself: "Congress enacted FOIA Exemption 5 . . . precisely because it determined that disclosure of material that is both predecisional and deliberative does harm an agency's decisionmaking process." *Nat'l Sec. Archive*, 752 F.3d at 464 (quoting *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 339 (D.C. Cir. 2011)). Thus, even without considering the agency's declarations discussing the threatened harm, because the material is both predecisional and deliberative, this Court declines to "second-guess that congressional judgment on a case-by-case basis." *McKinley*, 647 F.3d at 339.

The closer question is whether DOJ can apply the deliberative process privilege to withhold the material in full. Plaintiff's briefings suggest that, because there is "a great deal of factual information in the document," Pl.'s First Mem. P. & A. 11, the case hinges on a straight-

forward application of the deliberative process privilege's "fact/opinion distinction," which "'offers a quick, clear, and predictable rule of decision,' for most cases." *Wolfe v. HHS*, 839 F.2d 768, 774 (D.C. Cir. 1988) (quoting *Mead Data Cent.*, 566 F.2d at 256). But as the Circuit's "for most cases" caveat suggests, this distinction (facts are to be disclosed; opinions are not) is not a bright line rule; to the contrary, "[i]n some circumstances, even material that could be characterized as 'factual' would so expose the deliberative process that it must be covered by the privilege," and "court[s] cannot mechanically apply the fact/opinion test," *id*. (quoting *Mead Data Cent.*, 566 F.2d at 256). Thus, what this Court must determine is a subtly distinct question: "whether any factual material in the records at issue reveals the agency's deliberative process." *Morley*, 508 F.3d at 1127 (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), vacated in part on other grounds, 724 F.2d 201 (D.C. Cir. 1984)); *see also Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). This inquiry is "dependent upon the individual document and the role it plays" in the agency's process, *Senate of the Com. of Puerto Rico*, 823 F.2d at 586 (quoting *Coastal States*, 617 F.2d at 867) and requires attention to "the context in which the materials are used" and the relationship between the requested information and "the policies and goals that underlie the deliberative process privilege," *Wolfe*, 839 F.2d at 774. In order to conduct the context-specific inquiry that is required, the Court first applies these principles to the 16 pages discussing Dr. Ivins and then considers the IMCS's TOC.

### 1. IMCS Pages Discussing Dr. Ivins

As the Court just discussed, the IMCS was drafted for FBI, USPS, and DOJ "leadership," with the goal of compiling and distilling "input" to "aid[] the investigators in making appropriate decisions" at an interim stage of the FBI's investigation. Second Hardy Decl. ¶ 12 (citing First Hardy Decl. ¶¶ 80–81, ECF No. 14-1). Mr. Dillon emphasizes that much of this information is

factual. Pl.'s First Mem. P. & A 11. Logically, this point carries some weight: "[it] is true that the products of such labors can loosely be characterized as factual, in the sense that the issues ultimately being addressed have a prominent factual component." *Mapother v. DOJ*, 3 F.3d 1533, 1538 (D.C. Cir. 1993) (discussing compilation of factual material to create summary for agency decisionmaker). But as a matter of controlling law, that is not the end of the matter. In *Mapother* and a prior case, *Montrose Chemical*, 491 F.2d 63, the Circuit established the baseline principle that a court is "bound to shelter factual summaries that were written to assist the making of a discretionary decision." *Mapother*, 3 F.3d at 1539. This principle must be balanced, though, against other controlling precedent which instructs that "a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material." *Playboy Enterprises, Inc. v. DOJ*, 677 F.2d 931, 935 (D.C. Cir. 1982).

Here, attention to the context in which the report was drafted reveals why it contains more than "only those facts" that were seen as important to the IMCS's compilers. The IMCS is not just a compilation of facts; to the contrary, it is facts bound up and intertwined with "assessments, opinions, recommendations, and analyses by the FBI and USPS based on incomplete evidence gathered partially through the investigation." Seidel Decl. ¶ 77. Thus, it is not parallel to the report at issue in *Playboy Enterprises*, which the Circuit found could not be withheld under the deliberative process privilege because it was "prepared only to inform the Attorney General of facts which he in turn would make available to members of Congress." 677 F.2d at 936. The IMCS, like the summaries prepared for agency officials in *Mapother* and *Montrose Chemical*, required the FBI and USPS staff "to cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and to identify the significant issues they

encountered along the way." *Leopold v. CIA*, 89 F. Supp. 3d 12, 22 (quoting *Mapother*, 3 F.3d at 1538). Thus, in this particular context, a seemingly factual statement such as the time of a meeting with a potential informant or the number of samples of a particular kind of evidence collected becomes inextricably bound up in the broader discussion of investigative conclusions drawn and how the available evidence informs next steps.

Moreover, although the interim status of the IMCS is not itself dispositive, the Court also finds it significant that the IMCS was prepared to assist the agency in reaching a subsequent determination. As Defendant argues, the IMCS is by its very nature an interim draft created on the way to final investigative conclusions, which the FBI released in 2010. Def.'s Mem. 21 (citing Seidel Decl. ¶ 77). The deliberative process privilege shields draft material "when its disclosure would harm agency deliberations by 'divulg[ing] information regarding decisions to insert or delete material or to change [the] draft's focus or emphasis and thus would stifle the . . . candid exchange of ideas necessary to produce good . . . work." *Bloche v. DOD*, 414 F. Supp. 3d 6, 31 n.9 (D.D.C. 2019) (quoting *Bloche v. DOD*, 370 F. Supp. 3d 40, 53 n.3 (D.D.C. 2019); *see Hardy*, 243 F. Supp. 3d at 174. The Circuit has primarily addressed such drafts in the context of official agency histories. *See, e.g.*, *Nat'l Sec. Archive*, 752 F.3d at 465 (internal citations omitted) ("Our cases have made clear that a draft agency history may not be dissected by the courts in the manner suggested by the FOIA requester here."); *Dudman Commc'ns Corp*, 815 2d at 1569 (discussing *Russell v. Dep't of the Air Force*, 682 F.2d 1045 (D.C. Cir. 1982) and concluding that draft Air Force manuscript fell within Exemption 5).

In this case, the FBI edited and substantially altered the IMCS between 2006 and 2010. As the agency sets forth in its supporting declaration, "[t]he IMCS was drafted in 2006" as a "preliminary case study drafted midway through the anthrax investigation [that] contains

information, analyses, and suppositions based on the limited and incomplete evidence available at the time." Seidel Decl. ¶ 76. In contrast, the refined version published in final form in 2010 "consisted of ninety-two (92) pages and detailed the government's final evidence, findings, and conclusions." *Id.* Revealing the earlier form of the document, then, would permit comparisons of the draft and the final investigatory conclusions in ways that would expose the agency's underlying decisionmaking process, just as Defendant argues. *Id.* ¶ 77. With an eye to "the policies and goals that underlie the deliberative process privilege," *Wolfe*, 839 F.2d at 774, the Court finds Defendant's arguments compelling: revealing the material in the interim report would compromise agency staff's ability to candidly express their tentative conclusions and assessments of evidence in the context of an ongoing, interagency deliberation about investigatory next steps.

Accordingly, the Court finds that the deliberative process privilege covers the 16 pages of the IMCS discussing Dr. Ivins that the Court has reviewed *in camera*.[14]

### 2. IMCS Table of Contents

Furthermore, in situating the IMCS as part of the FBI's deliberative process of compiling and synthesizing material for an interim investigative report to inform senior leadership, the Court must part ways with Plaintiff's characterization of the TOC as "wholly factual." Pl.'s First Mem. P. & A. 11. A TOC is, naturally, a list of information. At the risk of stating the obvious,

---

[14] The Court does not mean to suggest that a request for particular factual material that happens to be found in the report would compel the same conclusion. As the Circuit noted in *Dudman Commc'ns Corp*, "[i]f a person requests particular factual material-*e.g.,* material relating to an investigation of a war crime-an agency cannot withhold the material merely by stating that it is in a draft document." 815 F.2d at 1569. Here, however, Mr. Dillon has not requested particular factual material. He has requested particular portions of the IMCS. As a result, the FBI cannot "excise the material from the draft document and disguise the material's source, and thus . . . release the material without disclosing any deliberative process." *Id.*

the function of the table of contents is to organize and direct the reader to material in the overall report. But it is a mistake to conclude that the organizational function of the TOC makes the material fundamentally factual. Even if it contains facts, its compilation required multiple decisions about how to structure the TOC, including what to focus on, what to exclude, and how one particular item in the investigation relates to another investigative pathway.

Put simply, the TOC "reflects an 'exercise of discretion and judgment calls,'" *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (quoting *Mapother*, 3 F.3d at 1539), about how to synthesize vast quantities of investigative data and organize them in a useful fashion for senior leadership. In contrast to, for instance, a narrative structure that is "organized strictly chronologically, not thematically," and which therefore falls outside the scope of the privilege, *Mapother*, 3 F.3d at 1540, the TOC is "part and parcel," Def.'s Mem. 20–21 (citing Seidel Decl. ¶ 76) of the investigatory deliberative process. It is not merely "presented for purposes of orientation," without "betray[ing] the occasion that gave rise to its compilation." *Mathopher*, 3 F.3d at 1540. The TOC is itself the summation of "the occasion that gave rise to its compilation," *id.*, because it was compiled to implement the directive, from the agency's leadership, for employees to compile and distill input as part of an interim report that would inform final investigative decision-making. Seen this way, because the TOC is itself such a core component of the overall deliberative process, disclosure of it would reveal "what materials [agency leadership] considered significant in reaching a proper decision" concerning the investigation. *Id.* at 1539 (quoting *Playboy Enterprises*, 677 F.2d at 936). Nor, based on the Court's *in camera* review of the material, are there "reasonably segregable" portions that could be released without effectively exposing key parts of the decisional choices that the agency made and thereby "enable[ing] the public to probe [the] agency's deliberative processes." *Leopold*, 89

F. Supp. 3d at 21 (citing *Ancient Coin Collectors Guild*, 641 F.3d at 513).  Thus, the TOC may

be withheld in full pursuant to the deliberative process privilege.[15]

## V.  CONCLUSION

For the foregoing reasons, Defendant's renewed motion for summary judgment is

**GRANTED** and Plaintiff's cross-motion is **DENIED**.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.


Dated:  March 16, 2020                                              RUDOLPH CONTRERAS
                                                                   United States District Judge

---

[15] Because it reaches this conclusion, the Court does not address Defendant's other claimed FOIA exemptions.  It bears emphasis that this conclusion, like the Court's conclusion concerning the other 16 withheld pages of the IMCS, is one that the Court arrives at only with respect to the material it has examined *in camera*.  The Court does not endorse a categorical deliberative process privilege exemption for any interim investigative report, and DOJ (or other agencies) should not read this opinion as license to invoke the privilege as blanket cover for more voluminous withholdings or as a matter of course, without far more specific argumentation concerning the particular deliberative process at issue, the relationship between the withheld material and that process, and a non-conclusory explanation of why factual material cannot be meaningfully segregated.